### COLUMBIA RIVER PEOPLE'S UTILITY DISTRICT, Plaintiff,

v.

### PORTLAND GENERAL ELECTRIC COMPANY, Defendant.

#### No. Civ. 98–1497–JO.

United States District Court, D. Oregon.

March 23, 1999.

---

Thomas A. Balmer, Ater Wynne Hewitt Dodson & Skerritt, Portland, OR, for plaintiff.

William F. Martson, Jr., Tonkon Torp Galen Marmaduke & Booth, Portland, OR, for defendant.

### JUDGMENT

ROBERT E. JONES, District Judge.

Based upon the record,

IT IS ORDERED AND ADJUDGED this action is dismissed.

### OPINION AND ORDER

Plaintiff Columbia River People's Utility District ("CRPUD"), a People's Utility District or "PUD" organized under state law, brings this action for declaratory and injunctive relief for alleged antitrust violations against defendant Portland General Electric ("PGE"). The parties' dispute centers on the right to provide electrical power to the Boise Cascade plant in St. Helens, Oregon. CRPUD seeks a declaration that certain provisions of an agreement between it and PGE and, consequently, certain provisions of a stipulation for entry of judgment in a state court case constitute an agreement between competitors not to compete for a particular customer and are, therefore, invalid and unenforceable under federal antitrust laws.

The case is before me on PGE's motion to dismiss the complaint for lack of subject matter jurisdiction and for failure to state a claim under Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6). I conclude that for the reasons stated below, the complaint should be dismissed.

### STANDARDS

PGE seeks dismissal under Rule 12(b)(1), lack of subject matter jurisdiction, and 12(b)(6), failure to state a claim. Both parties have presented extrinsic evidence outside the complaint. Neither party has objected, and I have considered the evidence. Thus, standards that ordinarily would govern my decision on a facial attack on the complaint do not apply.

■ With respect to PGE's Rule 12(b)(1) motion, because it is a "speaking motion," *i.e.,* supported by matters outside the complaint, my review is not limited to CRPUD's allegations, *see Roberts v. Corrothers,* 812 F.2d 1173, 1177 (9th Cir.1987), and no presumptive truthfulness attaches to them. *GTE Northwest Inc. v. Hamilton,* 971 F.Supp. 1350, 1353 (D.Or.1997). I may consider the extrinsic evidence and, if necessary, resolve factual disputes. *Eitel v. Reagan,* 898 F.Supp. 734, 737 (D.Or. 1995).

■ With respect to PGE's Rule 12(b)(6) motion, ordinarily I must accept the allegations of the complaint as true, *Parks School of Business, Inc. v. Symington,* 51 F.3d 1480, 1484 (9th Cir.1995), and must resolve all doubts in favor of the nonmoving party. *Keams v. Tempe Technical Institute,* 39 F.3d 222, 224 (9th Cir. 1994). But because both parties submitted extrinsic evidence, which I have considered, I have discretion to convert the motion to dismiss to a motion for summary judgment. *See, e.g.,* Fed.R.Civ.P. 12(b)(6);

*Garaux v. Pulley*, 739 F.2d 437, 438 (9th Cir.1984).

Under Rule 56, summary judgment should be granted if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). If the moving party shows that there are no genuine issues of material fact, the non-moving party must go beyond the pleadings and designate facts showing an issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A scintilla of evidence, or evidence that is merely colorable or not significantly probative, does not present a genuine issue of material fact. *United Steelworkers of America v. Phelps Dodge*, 865 F.2d 1539, 1542 (9th Cir.1989). Reasonable doubts as to the existence of a material factual issue are resolved against the moving party. *T.W. Elec. Service v. Pacific Elec. Contractors*, 809 F.2d 626, 631 (9th Cir.1987). Inferences drawn from facts are viewed in the light most favorable to the non-moving party. *Id.* at 630–31.

■ Of course, the court may not treat a Rule 12(b)(6) motion as one for summary judgment unless the nonmoving party is given "reasonable opportunity to present all material made pertinent to such a motion by Rule 56." Fed.R.Civ.P. 12(b). The Ninth Circuit does not require strict adherence to formal notice requirements, but instead examines the record to determine whether the party against whom summary judgment is entered was " 'fairly apprised that the court would look beyond the pleadings and thereby transform the 12(b) motion to dismiss into one for summary judgment.' " *Garaux*, 739 F.2d at 439 (*quoting Mayer v. Wedgewood Neighborhood Coalition*, 707 F.2d 1020, 1021 (9th Cir.1983)). Because both parties submitted extrinsic evidence [1] and I raised the possibility of conversion several times during oral argument, without objection by

---

1. *See Arnold v. Air Midwest, Inc.*, 100 F.3d 857, 859 (10th Cir.1996) (when a party submits material beyond the pleadings in oppos-

CRPUD, I am satisfied that the notice requirements have been met.

## DISCUSSION

### 1. State Law Framework of Utility Regulation

In 1961, the Oregon Legislature enacted "territory allocation" statutes with the specific purpose of eliminating competition between utilities. ORS 758.405 provides:

> **Purpose of ORS 758.400 to 758.475.** The elimination and future prevention of duplication of utility facilities is a matter of statewide concern; and in order to promote the efficient and economic use and development and the safety of operation of utility services while providing adequate and reasonable service to all territories and customers affected thereby, it is necessary to regulate in the manner provided in ORS 758.400 to 758.475 all persons and entities providing utility services.

To accomplish the goal of putting an end to expensive duplication of utility services, the Legislature enacted a statutory procedure through which a utility could obtain an exclusive service territory. If a territory is being served by only one utility, that utility can simply apply to the Oregon Public Utilities Commission ("OPUC") for exclusive status. ORS 758.435. If the territory is shared by two or more utilities, they must first agree on allocation, then apply to the OPUC for approval of their respective exclusive territories. ORS 758.410. In either case, an exclusive territory comes into existence only upon OPUC's approval.

Once territory is allocated, that is, once territory is allocated as exclusive territory by approval of the OPUC, then:

> no other person shall offer, construct or extend utility service in or into an allocated territory.

ing a motion to dismiss, the party's own action gives him notice that the judge may treat the motion as one for summary judgment).

ORS 758.450(2). The relevant exception to this, discussed below, is that a PUD like CRPUD, which is a local government organized under ORS Chapter 261, can exercise its statutory power of eminent domain to oust an existing electrical provider, like PGE, by condemning the property and facilities used to provide electricity. The PUD then succeeds to the ousted provider's exclusive allocation of the area served by the condemned facilities and property. *See* ORS 758.470(1), which provides:

> [The territory allocation statutes] shall not be construed or applied *** to restrict the exercise of the power of condemnation by a municipality; and when a municipality has condemned or otherwise acquired another person's equipment, plant or facilities for rendering utility service, it shall acquire all of the rights of the person whose property is condemned to serve the territory served by the acquired properties.

## 2. PGE's and CRPUD'S Relationship and Status

In 1963, shortly after the Oregon Legislature enacted the territory allocation statutes, PGE applied for and obtained OPUC's approval of an exclusive territory for much of the area it was serving, including the Boise Cascade tract at issue here. According to PGE, "[t]hat means that under Oregon law it has been unlawful since 1963 for anyone else to attempt to provide electricity to the Boise tract." Defendant's Memorandum in Support, p. 3; *see* ORS 758.450(2) (quoted above).

Meanwhile, CRPUD has existed as a PUD since 1940. Until 1980, however, CRPUD was unable to obtain voter approval to issue bonds for the purchase or construction of electric power distribution facilities. In other words, CRPUD existed as a municipality, but was unable to provide any service.

According to CRPUD, in 1978 it obtained voter approval of a tax levy to conduct a feasibility study of the purchase of PGE's electrical distribution facilities inside CRPUD's boundaries. After the study showed the purchase to be feasible, in 1980 CRPUD voters approved a bond measure to finance the acquisition of facilities from PGE. CRPUD sought to negotiate a purchase from PGE, but PGE refused. Consequently, in 1981, CRPUD initiated condemnation proceedings in Columbia County Circuit Court. Affidavit of Robert Lucas, ¶¶ 3–4.

Before trial, the parties negotiated a settlement agreement in which PGE agreed to sell certain utility property and facilities, specifically excluding the facilities and property necessary to serve Boise Cascade, to CRPUD. Affidavit of Robert Lucas, ¶ 6. The parties executed a Stipulation for Entry of Judgment ("Stipulation"), which set forth the terms of settlement, and a Stipulated Judgment, which incorporated the Stipulation. The Stipulated Judgment was entered on January 20, 1984.[2]

The key provisions of the Stipulation with respect to the present dispute are as follows:

1. CRPUD agreed to pay PGE $13 million for certain property and facilities, "except and excluding any and all facilities serving or necessary to serve the Boise Cascade facility described in paragraph 14 ***." Stipulation, ¶ 1 (Affidavit of Barbee Lyon, Exhibit 4).

2. With respect to Boise Cascade, the Stipulation provides:

> In the event CRPUD seeks to acquire by condemnation or negotiation the facilities serving or necessary to serve Boise Cascade, or in fact serves Boise Cascade, it is agreed that CRPUD shall pay PGE the appraised value of said facili-

---

**2.** CRPUD contends that the state court did not hold a hearing or make findings on the merits of the settlement. *See* Plaintiff's Response, p. 3. While that may be so, CRPUD, represented by counsel, agreed to the Stipula-

tion and the Stipulated Judgment. If CRPUD wishes to contest the fairness of its own agreement, that argument should be directed to the state court, which expressly retained jurisdiction to resolve such disputes.

ties in the amount of $31,710,046.00, which figure shall be escalated annually by an amount based upon a mutually acceptable index designed to track inflation.

Stipulation, ¶ 14.

3. Finally, the Stipulation provides that: "The overriding consideration for this settlement is the intent that PGE shall exclusively serve Boise Cascade indefinitely. In the event that CRPUD commences to serve Boise Cascade, this settlement and all agreements attendant thereto shall be void at the option of PGE and in such case the judgment herein shall be vacated in each and every respect." Stipulation, ¶ 16.

The Stipulated Judgment, which incorporates the Stipulation (which also is attached as an exhibit to the Stipulated Judgment), includes the following provisions:

2. All facilities and property necessary to serve Boise–Cascade and the sole and exclusive right to serve and provide electricity to Boise–Cascade shall remain with and is reserved to defendant. Plaintiff expressly relinquishes and waives forever any and all rights to acquire the facilities and properties necessary to distribute electricity to or serve Boise–Cascade.

\* \* \* \* \* \*

5. The Stipulation for Entry of Judgment dated January 19th, 1984, by and between the parties is attached as Exhibit B and is hereby made a part of this Stipulated Judgment. The court hereby retains jurisdiction of this case to aid in the enforcement, completion or termination of the agreements made in the Stipulation for Entry of Judgment.

Stipulated Judgment (Affidavit of Barbee Lyon, Exhibit 4, pp. 1–2).

The Acquisition Agreement, dated May 7, 1984, that memorialized CRPUD's purchase of PGE's property and facilities includes the following language (which is the basis of at least part of CRPUD's antitrust allegations in this case):

BOISE CASCADE

In the event CRPUD seeks to acquire by condemnation or negotiation the facilities serving or necessary to serve Boise Cascade, or in fact serves Boise Cascade, it is agreed that CRPUD shall pay PGE the appraised value of the facilities to serve Boise Cascade in the amount of $31,710,046.00, which figure shall be escalated annually \*\*\*. In the event that CRPUD commences to serve Boise Cascade, this Agreement shall be void at the option of PGE. PGE's entitlement to such amount and the option to void the agreement shall be contingent on PGE giving CRPUD advance written notice describing the nature of the activity and CRPUD does not within 30 days of such notice terminate such condemnation proceedings, negotiation or service to Boise Cascade.

In November 1984, PGE filed an application with the OPUC for approval of the Acquisition Agreement with CRPUD. In January 1985, PGE filed a second application, this time for approval to exchange certain "fringe" property in Columbia County with CRPUD. The two applications were consolidated by OPUC.

On October 1, 1986, OPUC issued Order No. 86–1012 in the consolidated applications. As pertinent here, the OPUC approved PGE's application for the sale of utility property to CRPUD. Rather than analyze the request for exchange of service territories under ORS 758.460, the OPUC based its analysis on ORS 758.470 (which, as outlined above, reserves to municipalities the power to condemn facilities and property), and approved the sale. As relevant here, the OPUC found:

The proposed agreement by PGE to sell facilities was negotiated because of condemnation by [CRPUD].

\* \* \* \* \* \*

PGE filed its application for the Commissioner's authority to exchange service territories based on ORS 758.460, which requires the Commissioner to find that the exchange is in the public inter-

est. However, ORS 758.470 provides in substance that when a municipality condemns or otherwise acquires the facilities of a serving utility like PGE, it is entitled to all rights of PGE to serve the territory served by the acquired facilities. [CRPUD] is a municipality within the meaning of this section. Under this statute, it is therefore entitled to a transfer of that part of PGE's previously allocated service territory which lies within the boundaries of the District. Thus, the actual transfer of territory under such circumstances is a ministerial act.

Among others, the Order contains this conclusion: "[CRPUD] is entitled to a transfer of that portion of PGE's allocated service territory which lies within the District." *See* Defendant's Reply, Exhibit 2.

### 3. The Current Situation

CRPUD now wants to serve Boise Cascade and claims that it can do so for significantly less expense by building its own facilities. According to the Robert Lucas, one of CRPUD's attorneys,

> CRPUD has investigated the cost of building the substation and lines that would be needed for CRPUD to serve the Boise Cascade mill without acquiring utility property from PGE. CRPUD estimates that the necessary facilities could be constructed at a cost of no more than $2 million.

Affidavit of Robert Lucas, ¶ 11; *see also* Complaint, ¶ 14.

This statement appears to encapsulate CRPUD's motivation for filing the complaint in this court. CRPUD has an agreement and a state court judgment telling it that to serve Boise Cascade, it must pay PGE in excess of $31 million, even if it builds its own facilities, which CRPUD estimates would cost only $2 million. Consequently, CRPUD now characterizes the $31 million payment requirement as a

**3.** Although not alleged in CRPUD's antitrust complaint, there is a related dispute pending before the OPUC concerning the 1986 OPUC Order approving PGE's sale to CRPUD. The issue is whether that Order resulted in a

"penalty" and describes the Stipulated Judgment and the Acquisition Agreement as "agreements in restraint of competition," all in an effort to avoid the effect of its earlier agreements.

### 4. Analysis

CRPUD's complaint alleges that in 1984, CRPUD purchased real property, poles, substations, lines and other assets from PGE pursuant to an agreement between the parties. Complaint, ¶ 4, 5. The complaint acknowledges that the agreement prohibited CRPUD from serving Boise Cascade unless CRPUD pays PGE $31 million (identified as the "Penalty Provision" in the complaint), and that CRPUD and PGE entered into the Stipulation, which is discussed above. Complaint, ¶¶ 5, 6.

Notably, the complaint mentions nothing about CRPUD's 1981 condemnation action or the resulting Stipulated Judgment. Instead, CRPUD alleges only that the 1984 agreement and the Stipulation "constitute an agreement between competitors not to compete for a particular customer (Boise Cascade) and are thus invalid and [un]enforceable because they violate federal antitrust laws." Complaint, ¶ 10.

Thus, CRPUD's complaint carefully avoids raising important aspects of the parties' relationship or state utility regulation. To accept the allegations as "true," as CRPUD suggests the court should do, would be to overlook the true nature of the current controversy. Because the parties' submissions give me discretion to look beyond the allegations of the complaint, I elect to do so.

PGE argues that this court lacks subject matter jurisdiction because the entire controversy involves state law issues that lie entirely within the continuing jurisdiction of the Columbia County Circuit Court and the OPUC.[3] PGE's view of the issues is

transfer of the Boise Cascade property and facilities to CRPUD, even though the parties clearly never intended that result. To resolve this issue, on February 12, 1999, PGE filed a Petition for Declaratory Ruling before the

succinctly stated in its reply memorandum, as follows:

> Does *state* law forbid CRPUD from offering to serve Boise Cascade? PGE says yes, CRPUD says no. That is the dispute, and it is the only dispute.
>
> If PGE is wrong about state law, CRPUD *can* serve Boise Cascade. On the other hand, if PGE is right about state law, CRPUD *can't* serve Boise Cascade. Antitrust law has nothing to do with it.

PGE's Reply, p. 1.

CRPUD, on the other hand, argues that this court has jurisdiction to declare that the 1984 agreements and the Stipulated Judgment[4] are illegal agreements under federal antitrust laws. Among other cases, CRPUD relies on a Ninth Circuit decision, *Columbia Steel Casting v. Portland General Elec.*, 111 F.3d 1427 (9th Cir.1996). Specifically, CRPUD relies on the Ninth Circuit's statement in *Columbia Steel* that "[i]n the absence of state-action immunity, an agreement between [two utilities] to divide [a service territory] for electricity constitutes a per se violation of § 1 of the Sherman Act." 111 F.3d at 1444.

To understand the relevance of that statement to this litigation requires discussion of the essential facts giving rise to the *Columbia Steel* decision. For many years, PGE and Pacific Power & Light ("PP & L") competed for customers in Portland, and for many years, they had attempted to gain OPUC approval for a division of the Portland market into exclusive service territories. These efforts were unsuccessful, in part because of opposition from the City of Portland. In 1972, PGE and PP & L jointly submitted to the City a plan to eliminate competition between them by dividing the City into exclusive service territories. The City disapproved the plan, but agreed that the duplication of facilities should be eliminated for aesthetic, safety,

and economic reasons. The City then passed an ordinance that, as relevant, only "approved 'the sale, transfer and exchange of plant and property between PGE and PP & L.'" *Columbia Steel,* 111 F.3d at 1433.

After securing the City's approval to that extent, in 1972 PGE and PP & L entered into an agreement (the "1972 Agreement") that they then submitted to the OPUC for approval. In contrast to the plan they had submitted to the City, the 1972 Agreement submitted to OPUC said nothing about exclusive territories in Portland. 111 F.3d at 1433. It did say, however, that one of the purposes of the 1972 Agreement was "to comply with the terms of the Portland ordinance," which, as stated, disapproved of exclusive territories but approved an exchange of plants and property. 111 F.3d at 1434.

The OPUC approved the 1972 Agreement. Significantly, however, the OPUC did not cite any of the statutory provisions that give OPUC authority to approve contracts between utility companies allocating exclusive service territories. Indeed, the OPUC order said nothing about exclusive service territories in Portland. 111 F.3d at 1434–35.

The division of territory worked until 1987, when Columbia Steel, a major customer of PGE, decided that it preferred PP & L's rates. Columbia Steel asked PP & L to provide service, but PP & L declined based upon what it considered to be PGE's exclusive territory. Columbia Steel repeated its request in 1989. This time, PP & L agreed. PGE objected, taking the position that the 1972 Agreement gave it the exclusive right to service Columbia Steel. 111 F.3d at 1435.

In 1990, Columbia Steel filed an antitrust action in federal district court against

---

OPUC. The Petition seeks a declaration that from the time the OPUC issued Order No. 39026 in 1963 and continuously until today, Boise Cascade has been located within the service territory exclusively allocated to PGE. *See* Defendant's Reply, Exhibit 1.

4. Actually, as PGE points out in reply, CRPUD avoids even mentioning the existence of the prior judgment.

PGE, PP & L, and the OPUC. PGE and PP & L raised a "state-action" immunity defense, arguing that the division of the Portland market was cloaked with antitrust immunity by the 1972 Order of the OPUC approving the agreement. 111 F.3d at 1436. The district court rejected the defense, based upon a finding that the OPUC's 1972 Order did not articulate a state policy to allocate exclusive service territories in Portland. In doing so, the district court acknowledged the provisions of ORS Chapter 758, stating:

> To the extent that a public utility provider obtains a lawful and valid contract for the allocation of territories and customers through the provisions of the territorial allocation statutes, *** that provider is immune from antitrust violations.
>
> ❖    *    *    *    ❖    *
>
> ***  In order to lawfully displace competition as the method of allocating customers for electric service in a particular area, utility companies must enter into a contract which allocates service territories and designates service to customers, and the utility companies must make application to and receive an order from the [O]PUC approving and establishing the allocation of these territories. These requirements must be met in order to receive the immunity which is provided by the state statutory scheme from the federal antitrust laws.

*Columbia Steel*, 111 F.3d at 1436–37 (quoting the district court opinion, *Pacificorp v. Portland Gen. Elec. Co.*, 770 F.Supp. 562, 570 (D.Or.1991) (Frye, J.)).

■  Thus, *Columbia Steel* turned on the district court's, and on appeal, the Ninth Circuit's finding that the agreement OPUC had approved did not establish exclusive service territories in the City of Portland. 111 F.3d at 1437. "In other words, the state did not approve the displacement of competition with territorial monopolies in the Portland market with the clarity re-

quired by *[California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980) ]." 111 F.3d at 1437.[5]

■  In contrast to the facts in *Columbia Steel*, the 1963 OPUC Order allocating territory to PGE speaks with clarity and clearly articulates the intent to allocate an exclusive territory, territory that includes the Boise Cascade tract. The 1963 Order states:

> [It is therefore] ORDERED that the amended Application of [PGE], Portland, Oregon, for allocation of territory within which to provide electric utility service, both as to exclusively served territory and adjacent unserved territory as applied for, be and the same hereby is approved; and it is further
>
> ORDERED that the territory herein allocated to [PGE] is as described in Appendix "A" hereto attached and by this reference made a part hereof ***

Affidavit of Barbee Lyon, Exhibit 2, p. 10.

The 1986 Order concerning PGE's sale of property and facilities to CRPUD approved transfer to CRPUD of "all rights of PGE to serve the territory served by the acquired facilities," thus giving CRPUD an exclusive territory. The only question is the extent of that territory; as discussed above, the question of the extent of the transfer (with or without Boise Cascade) currently is pending before OPUC. Thus, the "state-action" immunity exception to the per se rule of antitrust violation discussed *Columbia Steel* applies here.

Although PGE frames its argument in terms of lack of subject matter jurisdiction, I do not perceive the issue to be one of this court's power to hear CRPUD's antitrust claim; rather, I perceive the issue to be whether PGE has an absolute defense. CRPUD would have the court reserve a ruling on PGE's defense for

---

5.  *Midcal* holds that the state-action doctrine cloaks anticompetitive conduct with antitrust immunity only if the state's intent to displace competition with regulation is "clearly articulated and affirmatively expressed as state policy." *California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 105, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980).

another day, but given the record in this case, I see no just reason to delay a disposition that is inevitable. Under the analysis of *Columbia Steel,* I hold that as a matter of law, PGE's actions are cloaked with state-action immunity from antitrust violations. CRPUD's remedies, if any, for what it believes to be an unfair agreement and judgment, lie within the jurisdiction of the state court and OPUC. I make this ruling under the aegis of Rule 56 on conversion of PGE's Rule 12(b)(6) motion to dismiss for failure to state a claim. Accordingly, PGE's motion is granted, but for the reasons and under the standards set forth above.

## CONCLUSION

PGE's motion to dismiss (# 10) is GRANTED as set forth in this opinion. Any other pending motions are denied as moot.