**LEGACY WIRELESS SERVICES, INC., an Oregon corporation,**
Plaintiff,

v.

**HUMAN CAPITAL, L.L.C., a Michigan limited liability company,**
Defendant.

Civil No. 03–1416–MO.

United States District Court, D. Oregon.

April 20, 2004.

Barton C. Bobbitt, Barton C. Bobbitt, P.C., Portland, OR, for Plaintiff.

Charles T. Smith, Scott J. Meyer, Shawn M. O'Neil, Mitchell Lang & Smith, Portland, OR, for Defendant.

## OPINION AND ORDER

MOSMAN, District Judge.

In this breach-of-contract action plaintiff Legacy Wireless Services, Inc. ("Legacy") filed a petition to compel arbitration under the Federal Arbitration Act. Defendant Human Capital, L.L.C. ("Human Capital") responded with a motion to dismiss Legacy's petition. Human Capital argues that the court lacks subject matter jurisdiction because complete diversity does not exist. Human Capital further argues that the transaction at issue does not involve commerce and thus is not within the Arbitration Act's scope. Alternatively Human Capital argues that it cannot be required to arbitrate because it did not sign the arbitration agreement at issue. Because the court agrees that subject matter jurisdiction exists and the record thus far indicates Human Capital cannot avoid the arbitration clause, Human Capital's motion to dismiss is DENIED. (Doc. # 9).

## I. BACKGROUND

This lawsuit asks the court to decide a single issue: whether defendant Human Capital, L.L.C., a Michigan company, must participate in an arbitration currently pending in Portland, Oregon. The underlying arbitration involves a contract dispute between plaintiff Legacy Wireless Services, Inc. ("Legacy"), an Oregon citizen, and HC of Oregon, Inc. ("HC"), also an Oregon citizen. While Human Capital does not own any part of HC, the two companies work closely together.

Both HC and Human Capital are in the business of providing employment manage-

ment services. Human Capital calls itself a "professional employer organization" or "PEO." As a PEO Human Capital manages human resources, employee benefits, payroll, and workers' compensation issues.

Legacy develops real estate and constructs cell-phone towers in Oregon. In an effort to reduce employment-related costs Legacy sought to hire a PEO. Legacy's insurance agent referred Legacy to Human Capital. In response to Legacy's contacting it, Human Capital provided Legacy with promotional materials explaining its services. In those promotional materials Human Capital lists a Michigan address as its corporate office. HC is based in Beaverton, Oregon, and its registered agent also is located in Beaverton. It does not have a Michigan office, but appears to have an office in Vancouver, Washington.

After some preliminary meetings, on July 29, 2002, Legacy entered into an "Employee Management Service Agreement" ("employee management agreement") with HC. Human Capital is not a party to that agreement; nor does the agreement otherwise mention Human Capital. The only signatories to the agreement are an HC representative and a Legacy representative.

The agreement required HC to take responsibility as a PEO for numerous employment-related activities. In return for HC's services, Legacy agreed to pay HC "an administrative fee equal to one and three quarters (1.75%) of gross payroll per pay period."

The employee-management agreement included a broad arbitration clause governing "any dispute" arising between HC and Legacy. It further provided that Oregon law would apply to any dispute.

Again, Human Capital was not a party to the employee-management agreement signed by HC and Legacy. Legacy, however, often was referred to Human Capital

personnel based in Michigan. For instance HC gave Legacy materials which listed Human Capital's Michigan phone and fax numbers. Legacy also returned various documents to Human Capital's Michigan offices. Moreover certain documents identified the relevant management entity as "Human Capital, L.L.C. *d.b.a.* HC Oregon." (Emphasis added). Legacy additionally emphasizes that various relevant documents use the mark "Human Capital," rather than HC Oregon.

While Human Capital is not a party to the employee-management agreement, it is a party to a separate agreement—titled "Management Fee Service Contract" ("management fee agreement")—entered into with HC. Human Capital and HC signed this agreement on January 1, 2000. Under the management fee contract Human Capital agreed to, among other so-called payroll-processing duties, manage HC's client information and direct deposit issues related to HC's "professional employer administration services." Human Capital further agreed to provide HC with unlimited "phone assistance" for all employment-related issues. The agreement also permitted HC to use Human Capital's trade and service marks.

In return for Human Capital's management services, HC agreed to pay Human Capital "management fees" which are calculated as follows: "One-half of the administrative fees HC Oregon collects and charges HC Oregon's clients." The management-fee agreement between HC and Human Capital also contained an arbitration clause, governing any dispute between HC and Human Capital "arising out of or related" to the management-fee agreement. The arbitration clause specified Michigan as the required arbitral forum.

As mentioned, HC and Legacy currently are parties to arbitration proceedings in Portland. Legacy concedes that the arbi-

tration proceedings do not arise out of the management-fee agreement, to which Legacy is not a party, but instead arise out of the employee-management agreement, to which Legacy and HC are signatories. Legacy alleges in the arbitration proceedings that HC breached the employee-management agreement in failing to register either itself or Human Capital with the state contracting board, as Oregon law required, thus causing Legacy to lose an important construction job. Legacy filed a petition with this court seeking an order compelling Human Capital to participate in the Portland arbitration.

Human Capital responded by filing a motion to dismiss Legacy's petition. Human Capital's motion rests primarily on three arguments: (1) the court does not have subject-matter jurisdiction because Legacy's petition fails to name a non-diverse, indispensable party (*i.e.*, HC); (2) the Federal Arbitration Act ("FAA")—under which Legacy brings its petition—does not apply because the agreement at issue does not implicate interstate commerce; and (3) because it did not sign the employee-management agreement, pursuant to which the Portland arbitration was filed, Human Capital cannot be forced into the arbitration. Human Capital additionally argues that Michigan, rather than Oregon, is the proper venue for Legacy's petition.

## II. STANDARDS OF REVIEW

Human Capital filed its motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b). Human Capital's jurisdictional argument is asserted under Rule 12(b)(1), which provides that a party may file a motion seeking dismissal for lack of

subject matter jurisdiction.[1] Human Capital makes two arguments under its jurisdictional challenge: (1) there is no diversity jurisdiction because Legacy failed to name a nondiverse, indispensable party; and (2) the underlying agreement did not involve interstate commerce and thus is not governed by the FAA.[2]

Jurisdictional disputes regarding subject matter must be resolved before the court considers the merits. When a complaint is challenged for lack of subject matter jurisdiction on its face, all material allegations in the complaint will be taken as true and construed in the light most favorable to the plaintiffs. See *Columbia R. People's Util. v. Portland General Elec. Co.*, 40 F.Supp.2d 1152, 1153 (D.Or.1999). But when, as in this case, the movant has presented extrinsic evidence, the court's review is not limited to the allegations. *Id.* Because subject matter jurisdiction strikes at the core of a court's authority, disputed fact issues will not preclude the court from " 'evaluating for itself the merits of jurisdictional claims.' " *AHTNA Gov't Servs. Corp. v. 52 Rausch, L.L.C.*, No. 03–00130, 2003 WL 403359, at *3 (N.D.Cal. Feb.19, 2003) (quoting *Mortensen v. First Fed. Savs & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir.1977)); see also *Columbia R. People's Util.*, 40 F.Supp.2d at 1153.

Human Capital, however, also argues that, as a nonsignatory, it is not subject to the arbitration clause at issue. But it is not clear under which Rule, if any, Human Capital aims its motion as to this argument. While the actual motion to dismiss does not cite Rule 12(b)(6), Human Capi-

---

**1.** Human Capital's motion also cites subsection (2) of Rule 12, which governs challenges based on personal jurisdiction. Human Capital, however, concedes in its briefing that it is not challenging personal jurisdiction. See Human Capital's Reply Brief at 4.

**2.** It is not entirely clear that Human Capital's "commerce" argument is jurisdictional in nature. But, for purposes of resolving this motion, the court will, consistent with Human Capital's arguments, treat the argument as such.

tal's briefing broadly characterizes its motion as a "FRCP 12(b) Motion to Dismiss." Human Capital's "nonsignatory" arguments are not jurisdictional in nature and go to the merits of Legacy's petition. No discovery has occurred. Under the circumstances presented, the court will apply the Rule 12(b)(6) standard in evaluating Human Capital's "nonsignatory" arguments.

Pursuant to Rule 12(b)(6), the court must accept the initial pleading's allegations as true and resolve all doubts in favor of the non-movant. *Barron v. Reich,* 13 F.3d 1370, 1374 (9th Cir.1994). A court should not grant a motion to dismiss "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

In addition to the pleaded allegations, a court deciding a Rule 12(b)(6) motion also may consider "documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice." *United States v. Ritchie,* 342 F.3d 903, 908 (9th Cir.2003). But when the parties submit other extrinsic evidence, the court in its discretion must decide whether to convert the motion to dismiss to a motion for summary judgment. See Fed.R.Civ.P. 12(b)(6); *Columbia River People's Util.,* 40 F.Supp.2d at 1153. The "court may not treat a Rule 12(b)(6) motion as one for summary judgment unless the nonmoving party is given 'reasonable opportunity to present all material made pertinent to such a motion by Rule 56.'" *Columbia River People's Util.,* 40 F.Supp.2d at 1154.

In arguing its motion to dismiss Human Capital has submitted and relied on extrinsic evidence. While Legacy, too, has submitted extrinsic evidence, the court will not convert Human Capital's motion to dismiss into a motion for summary judg-

ment. There has been no discovery. Further fact development would benefit the proper resolution of the nonsignatory issue, as that issue (as discussed below) is quite fact-intensive and thus likely requires further investigation in order for Legacy to formulate an adequate response.

## III. DIVERSITY OF CITIZENSHIP

■ Section 4 of the FAA, under which Legacy files its petition, provides:

> A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court which, save for such agreement, would have jurisdiction under Title 28, in a civil action ... of the subject matter of a suit arising out of the controversy between the parties....

9 U.S.C. § 4. Based on this statutory language the Supreme Court has explained that: "Section 4 provides for an order compelling arbitration only when the federal district court would have jurisdiction over a suit on the underlying dispute; hence, there must be diversity of citizenship or some other independent basis for federal jurisdiction before the order can issue." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 25 n. 32, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983); see also *Owens–Illinois, Inc. v. Meade,* 186 F.3d 435, 439 (4th Cir.1999) ("Section 4 of the FAA confers jurisdiction in the district court over petitions to compel arbitration only to the extent that the federal court would otherwise have jurisdiction over the case.").

In the case at bar, the alleged independent jurisdictional basis is diversity of citizenship. Human Capital argues that diversity is lacking. Specifically it contends that Legacy's petition to compel arbitration fails to name HC, purportedly an indispensable party. Because HC, like Leg-

acy, is an Oregon corporation, Human Capital argues that adding the indispensable party to this lawsuit destroys diversity and thus defeats subject matter jurisdiction.

Federal Rule of Civil Procedure 19 identifies the circumstances under which an individual or entity qualifies as indispensable and, therefore, must be a named party to a lawsuit. The Rule 19 analysis requires a two-step approach: First, the court must decide whether HC qualifies as a "necessary party" which should be joined under the standards set forth by Rule 19(a). See *American Greyhound Racing, Inc. v. Hull*, 305 F.3d 1015, 1022 (9th Cir.2002). Second, if HC is "necessary," the court must then determine whether HC is "indispensable" to the dispute's proper resolution. See *id.* Assuming HC is necessary, the court must proceed to answer the second inquiry because HC, if added to the lawsuit, would destroy diversity. See Fed.R.Civ.P. 19(a) (requiring joinder of necessary party if doing so "will not deprive the court of jurisdiction over the subject matter").

Rule 19(a) establishes the standard for determining when a party is "necessary," providing:

A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multi-ple, or otherwise inconsistent obligations by reason of the claimed interest.

Fed.R.Civ.P. 19(a).

Subsection (b) of Rule 19 establishes the standard governing the second inquiry, whether the absent party is "indispensable." See Fed.R.Civ.P. 19(b). A party is indispensable when "in equity and good conscience the action" should not proceed without the absent party. *Id.* If the action cannot fairly proceed without the absent party the court should dismiss the case. *American Greyhound*, 305 F.3d at 1022. Because dismissal is a harsh result, however, the court undertakes the indispensability inquiry "pragmatically, in the context of the 'substance' of each case, rather than by procedural formula." *Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102, 119 n. 16, 88 S.Ct. 733, 19 L.Ed.2d 936 (1968). Rule 19(b) delineates four factors to guide the court in determining whether dismissal should result due to the inability to join a necessary party:

first, to what extent a judgment rendered in the person's absence might be prejudicial to the person or those already parties;

second, the extent to which, by protective order or other measures, the prejudice can be lessened or avoided;

third, whether a judgment rendered in the person's absence will be adequate;

fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.

Fed.R.Civ.P. 19(b).

Notably Human Capital does not even attempt to argue that Rule 19's specific requirements are met in this case. The court nevertheless will apply those requirements. The court concludes that HC does not qualify as a necessary party and that, even if it were a necessary party, it is

not an indispensable party justifying dismissal of Legacy's petition.

Given the Rule 19 standard, it is important to bear in mind the nature of the relief that is requested in the proceedings before the court. As indicated Legacy's petition presents one narrow issue: whether to require Human Capital to participate in the Portland arbitration proceedings. HC is not a necessary party in order to provide "complete relief," see Fed.R.Civ.P. 19(a); the absence of HC in no way prevents the court from either entering an order requiring Human Capital to arbitrate or denying Legacy's petition, thereby protecting Human Capital from having to participate in the Portland arbitration. See, e.g., *Doctor's Assocs., Inc. v. Distajo,* 66 F.3d 438, 446 (2d Cir.1995) (holding, in resolving petition to compel arbitration, that absent party was not "necessary" under Rule 19(a) because the district court could "grant all the relief sought" by petitioner—"an order compelling arbitration"). Nor is HC's situation such that "the disposition of the action" in its absence may "as a practical matter impair or impede" its ability to protect its interests. Fed. R.Civ.P. 19(a). Indeed HC already is engaged in the pending arbitration proceedings. The court also sees no risk that resolving Legacy's petition will cause either Legacy or Human Capital to incur "double . . . or otherwise inconsistent obligations." *Id.* The issue simply is whether Human Capital must proceed to arbitration. Although HC is a signatory to the underlying agreement, adding HC to this case does not change the issue nor how it will ultimately be resolved.

Additionally, even if HC were somehow deemed a necessary party, it is not indispensable. For reasons similar to those compelling the conclusion that HC is not "necessary," the first Rule 19(b) factor favors Legacy, that is, entering a judgment in HC's absence would not "be prejudicial"

to it, Human Capital, or Legacy. Fed. R. Civ. 19(b); see *American Greyhound,* 305 F.3d at 1024–25 ("the first factor of prejudice . . . largely duplicates the consideration that made a party necessary under Rule 19(a): a protectable interest that will be impaired or impeded by the party's absence.").

Thus, because the court does not glean any real risk of prejudice from proceeding without HC, the second factor—whether the risk of prejudice may be lessened by "the shaping of relief," Fed.R.Civ.P. 19(b)—is unimportant in this case. Similarly, for the reasons largely discussed above, the court finds that the third Rule 19(b) factor favors Legacy, as the court may render an "adequate" order in this case despite HC's absence. The only factor which favors Human Capital is the fourth factor, given that it appears Legacy would retain an alternative adequate remedy in state court if the court were to dismiss its petition. Considering all four Rule 19(b) factors together, however, the court (assuming HC is "necessary") cannot conclude in "equity and good conscience" that a dismissal would be appropriate. See *id.*

It is true courts using the Rule 19 analysis occasionally find diversity jurisdiction lacking over a petition to compel arbitration. But those cases are inapposite. For instance, in *Owens–Illinois, Inc. v. Meade,* 186 F.3d at 441–42, the Fourth Circuit dismissed a petition to compel arbitration because deciding the petition gave rise to a risk of inconsistent legal obligations. The court reached its conclusion because both the federal district court and a state court were asked to "make determinations on the validity and interpretation of the Agreement" containing the arbitration clause. *Id.* at 441. Under such circumstances, one court might compel arbitration while the other might not, thus put-

ting the parties in a "factual and legal 'whip-saw.'" *Id.;* see also *PaineWebber, Inc. v. Cohen,* 276 F.3d 197, 201 (6th Cir. 2001) (upholding district court's finding that absent party was "necessary" to decide arbitration issue because if "a federal court and a state court reached different conclusions regarding whether the arbitration clauses apply to Cohen's claims ... Cohen would be faced with inconsistent procedural remedies against the alleged joint tortfeasors").

In the case at bar, there is no risk of another court applying the arbitration clause at issue in a manner inconsistent with this court's ruling. Whether Human Capital is subject to the arbitration clause is not an issue pending in another court. In fact the only other parties at issue, HC and Legacy, have agreed to participate in the Portland arbitration. See, e.g., *Dominium Austin Partners, L.L.C. v. Emerson,* 248 F.3d 720, 724–26 (8th Cir.2001) (finding that absent party—who had already been ordered by state court to arbitration—was not "necessary," in part because plaintiffs "sought to compel no one but the" defendants named in the federal petition to arbitrate).

In sum the court rejects Human Capital's argument that the court lacks diversity jurisdiction over Legacy's petition.

## III. INTERSTATE COMMERCE

■ The FAA governs only if the arbitration provision is contained in "a contract evidencing a transaction involving commerce." 9 U.S.C. § 2. This statutory limitation reflects the fact the FAA was enacted pursuant to the power provided by the Commerce Clause. See *Southland Corp. v. Keating,* 465 U.S. 1, 11–12, 104 S.Ct. 852, 79 L.Ed.2d 1 (1984). Section 2, therefore, "embodies Congress' intent to provide for the enforcement of arbitration agreements within the full reach of the Commerce Clause." *Perry v. Thomas,* 482

U.S. 483, 490, 107 S.Ct. 2520, 96 L.Ed.2d 426 (1987). Given the sweeping reach of the Commerce Clause, the FAA plainly establishes a congressional policy "favoring arbitration agreements." *Moses H. Cone,* 460 U.S. at 24, 103 S.Ct. 927. As recently explained by the Supreme Court in discussing Section 2 of the FAA:

> We have interpreted the term "involving commerce" in the FAA as the functional equivalent of the more familiar term "affecting commerce"—words of art that ordinarily signal the broadest permissible exercise of Congress' Commerce Clause power. Because the statute provides for "the enforcement of arbitration agreements within the full reach of the Commerce Clause," it is perfectly clear that the FAA encompasses a wider range of transactions than those actually "in commerce"—that is, "within the flow of interstate commerce."

*Citizens Bank v. Alafabco, Inc.,* 539 U.S. 52, 123 S.Ct. 2037, 2040, 156 L.Ed.2d 46 (2003) (*per curiam*) (citations omitted). Thus, even when a transaction is entered into between residents of the same state and consummated in that state, the transaction implicates the FAA when "in the aggregate the economic activity in question" represents a "general practice subject to federal control." *Id.* (citation omitted). The particular transaction at issue "taken alone," therefore, need not have "any specific effect" on interstate commerce to implicate the FAA. *Id.*

Human Capital argues that, because HC and Legacy are Oregon corporations, the employee-management agreement between the two companies does not involve commerce. But, taken at the general level of analysis required by the Commerce Clause, the transaction easily "involves commerce." The agreement at issue seeks to regulate the contracting parties' relations with respect to numerous employees.

A primary part of the agreement, in fact, is ensuring that those employee relations comply with various federal laws, such as the federal Family Medical Leave Act. Cf. *Citizens Bank*, 123 S.Ct. at 2040 (observing that a transaction involves commerce when it represents activity "subject to federal control"). Employees are the engine that drives commerce.

In addition to the fact the agreement governs various employment issues subject to federal law, Human Capital (a Michigan corporation) played an important role in the consummation of the agreement. While at oral argument Human Capital asserted that it did not agree that the transaction at issue implicated interstate commerce, Human Capital has not sufficiently controverted allegations and record evidence revealing interstate contacts. For example, in seeking a PEO, Legacy originally was directed to Human Capital. In addition, even with respect to certain contacts with HC, it is undisputed that Legacy dealt with HC personnel working out of an office in Washington state. Legacy also received documents related to the underlying transaction which referenced Human Capital's Michigan address and phone numbers. And Legacy direct deposited its payments to HC into a Michigan bank account. Human Capital also does not rebut Legacy's position that, after it signed the contract with HC, Human Capital's Michigan offices maintained contact with Legacy and, in fact, assisted with services related to the contract. Thus, contrary to Human Capital's position, the transaction at issue did not involve simply intrastate contacts. In short the transaction falls within the scope of the FAA.

## IV. HUMAN CAPITAL AS A NONSIGNATORY

Human Capital next argues that it cannot be required to arbitrate because it was not a signatory to the employee-management agreement, to which only HC and Legacy are signatories. Legacy responds that Human Capital's status as a nonsignatory does not permit it to avoid the arbitration clause; specifically, Legacy argues that Human Capital may be subject to the arbitration clause under theories of agency, estoppel, and alter ego. In deciding whether any of the three theories may apply, the court again notes that it is treating Human Capital's motion for these issues as a Rule 12(b)(6) motion.[3]

While federal law establishes a strong policy in favor of compelling arbitration, see *Moses H. Cone*, 460 U.S. at 22–23, 103 S.Ct. 927, arbitration nevertheless is " 'a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.' " *AT & T Techs. v. Communications Workers of Am.*, 475 U.S. 643, 648, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986) (quoting *Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582–83, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960)). Human Capital, therefore, is correct that a party generally cannot be required to arbitrate pursuant to an agreement's arbitration clause which the party did not sign.

As the Ninth Circuit has recognized, however, "nonsignatories of arbitration agreements may be bound by the agreement under ordinary contract and agency principles." *Letizia v. Prudential Bache Secs., Inc.*, 802 F.2d 1185, 1187 (9th Cir. 1986). Indeed federal courts have recognized at least five specific doctrines justify-

---

**3.** Legacy also mentions assumption and incorporation-by-reference theories. The court, however, does not consider either of these two theories because Legacy has not ex-plained their applicability, nor does the court need to consider these theories for purposes of resolving Human Capital's motion to dismiss.

ing the application of an arbitration clause to a nonsignatory: " '(1) incorporation by reference; (2) assumption; (3) agency; (4) veil-piercing/alter ego; and (5) estoppel.'" *Smith/Enron Cogeneration v. Smith Cogeneration*, 198 F.3d 88, 97 (2d Cir.1999) (quoting *Thomson–CSF, S.A. v. American Arbitration Ass'n*, 64 F.3d 773, 776 (2d Cir.1995)); accord *Bridas S.A.P.I.C. v. Government of Turkmenistan*, 345 F.3d 347, 356 (5th Cir.2003); *Javitch v. First Union Secs., Inc.*, 315 F.3d 619, 629 (6th Cir.2003); *International Paper Co. v. Schwabedissen Maschinen & Anlagen*, 206 F.3d 411, 417 (4th Cir.2000). As noted, in resolving the current motion, the court will discuss only the theories of agency, estoppel, and alter ego.

## A. Agency

■ Legacy's briefing asserts that Human Capital acted as HC's agent. See Legacy's Response Brief at 2. Human Capital denies this allegation. Even assuming that Human Capital acted as HC's agent, however, the court would be hesitant to apply the agency exception in this case, for the reasons briefly discussed below.

As courts in the Ninth Circuit have recognized, agency theory may justify applying an arbitration clause to a nonsignatory:

> Federal courts have consistently afforded agents, employees, and representatives the benefit of arbitration agreements entered into by their principals to the extent that the alleged misconduct relates to their behavior as officers or directors or in their capacities as agents of the corporation.

*Boston Telecommunications Group, Inc. v. Deloitte Touche Tohmatsu*, 278 F.Supp.2d 1041, 1048 (N.D.Cal.2003) (quoting *Creative Telecommunications, Inc. v. Breeden*, 120 F.Supp.2d 1225, 1240–41 (D.Haw.1999)). If agents could not invoke their principals' arbitration provisions, a party easily could "avoid the practical consequences of an agreement to arbitrate by naming nonsignatory parties [as defendants] in his complaint or signatory parties in their individual capacities only," thereby effectively nullifying an arbitration agreement. *Arnold v. Arnold Corp.*, 920 F.2d 1269, 1281 (6th Cir.1990) (citation omitted); see also *Bel–Ray Co. v. Chemrite Ltd.*, 181 F.3d 435, 444 (3d Cir.1999) ("Since the [firm] could act only through agents and employees, 'an arbitration agreement would be of little value if it did not extend to them.'" (citation omitted)). Guided by the "strong federal policy favoring arbitration," the Ninth Circuit, in fact, has declined to allow a signatory to avoid an arbitration clause by suing another signatory's non-signatory agents individually. *Letizia*, 802 F.2d at 1187–88.

As the wealth of the case law relying upon an agency theory reveals, this theory has been applied when a signatory has brought claims against nonsignatory agents and the agents then seek to invoke the arbitration clause against the *signatory*. The situation is materially different when, as in the case at bar, a signatory seeks to invoke an arbitration clause against a *nonsignatory*.

Under basic agency theory: "Unless otherwise agreed, a person making or purporting to make a contract with another as agent for a disclosed principal does not become a party to the contract." Restatement (Second) of Agency § 320; see also *Bel–Ray Co.*, 181 F.3d at 445 ("Generally, of course, an agent of a disclosed principal, even one who negotiates and signs a contract for her principal, does not become a party to the contract."). Accordingly, even accepting Legacy's assertion that Human Capital acted as HC's agent in negotiating the employee-management contract, Human Capital apparently was acting on behalf of a disclosed principal and thus would

not be bound under agency principles to the contract. Bearing in mind that arbitration is strictly "contractual by nature," *Thomson–CSF,* 64 F.3d at 776, adhering to technical agency principles is justified when a signatory seeks to invoke the agency exception against a nonsignatory agent. Basic fairness principles more readily favor holding a *signatory* to a contract to which it specifically agreed. Courts, including the District of Oregon, have made the distinction between signatories and non-signatories in applying the agency exception. See, e.g., *Bel–Ray Co.,* 181 F.3d at 445 (declining to extend Ninth Circuit's reasoning in *Letizia* to situation where party sought to apply arbitration clause against an agent who had not signed the underlying agreement); *Clausen v. Watlow Elec. Mfg. Co.,* 242 F.Supp.2d 877, 883–84 (D.Or.2002) (declining to extend *Letizia* to situation where party sought to apply arbitration clause against an agent who had signed the underlying agreement only in his representative capacity).

Thus, to the extent Human Capital's motion to dismiss argues that agency theory does not compel it to arbitrate, the court would be more inclined to grant the motion. The court agrees that an agency relationship generally does not, itself, justify departure from the principle that a nonsignatory may not be compelled to arbitrate. Legacy, however, might be able to prove the application of at least two other exceptions to that general principle, as discussed below.

### B. Estoppel

Estoppel in some ways is broader than the agency exception. The court concludes that the estoppel theory, at least at this stage, saves Legacy's petition from dismissal.

Although it does not appear that the Ninth Circuit has expressly applied an estoppel theory in the arbitration context, several courts have done so. Like the agency exception, a primary underlying reason for the theory is that signatories should not be permitted to avoid arbitrating "claims of the very type" they agreed to arbitrate simply because they have sued a nonsignatory. *Bridas S.A.P.I.C.,* 345 F.3d at 361. Guided by such fairness concerns, several federal cases suggest "that a nonsignatory to an arbitration agreement may compel a signatory to arbitrate when the issues the nonsignatory is seeking to arbitrate are intertwined with the underlying agreement." *Thixomat, Inc. v. Takata Physics Int'l Co.,* No. 01–Civ.–5449, 2001 WL 863566, at *3 (S.D.N.Y. July 30, 2001); see, e.g., *Astra Oil Co. v. Rover Navigation, Ltd.,* 344 F.3d 276, 279 (2d Cir.2003); *Javitch,* 315 F.3d at 629; *E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.,* 269 F.3d 187, 199 (3d Cir.2001). Whether to apply estoppel in the arbitration context is a discretionary, fact-intensive decision. See *Bridas S.A.P.I.C.,* 345 F.3d at 360.

Nevertheless federal courts have been hesitant to apply the estoppel theory against nonsignatories. See, e.g., *Mag Portfolio Consult, Gmbh v. Merlin Biomed Group, Llc,* 268 F.3d 58, 62 (2d Cir.2001); *Bridas S.A.P.I.C.,* 345 F.3d at 361. As recently explained by the Fifth Circuit in distinguishing between signatories and non-signatories in relation to an arbitration clause:

It is more foreseeable, and thus more reasonable, that a party who has actually agreed in writing to arbitrate claims with someone might be compelled to broaden the scope of his agreement to include others.

*Bridas S.A.P.I.C.,* 345 F.3d at 361 (citation omitted). Requiring nonsignatories to arbitrate introduces an element of unpredictability to parties' private affairs, thereby

compelling a greater degree of vigilance in applying arbitration clauses.

Courts, therefore, have applied a more rigid standard when a signatory seeks to use estoppel to compel a nonsignatory to arbitrate. Thus Legacy's suggestion that signatories and nonsignatories are treated "equally" is unavailing. See Legacy's Brief in Opposition at 14.

■ As mentioned, when estoppel is applied as to a signatory courts ask whether the claims brought by the signatory against the nonsignatory are "intertwined" with the underlying agreement. See, e.g., *Astra Oil Co.*, 344 F.3d at 279. In contrast, when a signatory seeks to force a nonsignatory to arbitrate: the "signatory may not estop [the] nonsignatory from avoiding arbitration regardless of how closely affiliated that nonsignatory is with another signing party." *MAG Portfolio*, 268 F.3d at 62; accord *Bridas S.A.P.I.C.*, 345 F.3d at 361. As a result, the fact the merits of the claims are "inextricably intertwined" with the underlying agreement is "insufficient, standing alone, to justify application of equitable estoppel" against a nonsignatory. *Bridas S.A.P.I.C.*, 345 F.3d at 361. Expanding estoppel to apply just as easily against nonsignatories "would threaten to overwhelm the fundamental premise that a party cannot be compelled to arbitrate a matter without its agreement." *Id.* (citation omitted).

■ With the fundamental distinction between signatories and nonsignatories in mind, before applying estoppel against a nonsignatory, courts generally have required a showing that the nonsignatory obtained a "direct benefit" from the underlying contract, that is, a benefit "flowing directly from the agreement." *MAG Portfolio*, 268 F.3d at 61; see also *International Paper*, 206 F.3d at 418 ("A nonsignatory is estopped from refusing to comply with an arbitration clause when it receives a 'direct benefit' from a contract containing an arbitration clause." (citation omitted)); *Amkor Tech., Inc. v. Alcatel Bus. Sys.*, 278 F.Supp.2d 519, 521 (E.D.Pa.2003) ("the party seeking to enforce the arbitration clause must show that the non-signatory to be bound received a 'direct benefit' from the contract containing the clause.").

■ Based on the materials before the court it appears Legacy may be able to prove that Human Capital received "direct benefits" from the employee-management agreement and thus is estopped from avoiding the agreement's arbitration clause. For example, the management-fee agreement (attached to Legacy's petition) shows that, in return for Human Capital's services, HC was obligated to pay Human Capital fifty percent of "the administrative fees HC Oregon collects and charges HC Oregon's clients." In turn, pursuant to the employee-management agreement, Legacy was obligated to pay HC "administrative fees." Thus, construing the two agreements together, it appears that Human Capital received "direct benefits" from the employment-management agreement in the form of "administrative fees" paid by Legacy.[4]

The court acknowledges that several of the cases finding "direct benefits" estoppel involved nonsignatories asserting claims

---

4. The court notes that Legacy submitted an affidavit from James Kramer, Legacy's president, which supports an inference that Human Capital directly benefitted from the employee-management contract. Mr. Kramer avers that Legacy made no direct payments to HC in Oregon but rather deposited payments in an account in Michigan (where Human Capital is located). While the court need not and does not consider the affidavit in making the Rule 12(b)(6) analysis, the affidavit further indicates that Legacy might be able to show Human Capital's receipt of direct benefits flowing from the employee-management agreement.

which were based in part on the terms of the underlying agreement. As the Fifth Circuit recently observed:

> There is an important distinction, however, between cases where the courts seriously consider applying direct benefits estoppel, and the case at bar. In the former, the nonsignatory had brought suit against a signatory premised in part upon the agreement. Here, it is undisputed that the [nonsignatory] has not sued [the signatory] under the agreement. The [nonsignatory] has thus not "exploited" the [underlying agreement] to the degree that the cases that consider applying this version of estoppel require.

*Bridas S.A.P.I.C.*, 345 F.3d at 362 (citations omitted).

Other courts, however, have not focused on whether the nonsignatory actually sued under the agreement but on whether the nonsignatory "*directly* benefitted" from the agreement. *Thomson–CSF*, 64 F.3d at 779 (emphasis in original); see *International Paper*, 206 F.3d at 418 (stating as a general principle a "nonsignatory is estopped from refusing to comply with an arbitration clause when it receives a 'direct benefit' from a contract containing an arbitration clause"). For example, in *American Bureau of Shipping v. Tencara Shipyard S.P.A.*, 170 F.3d 349, 352–53 (2d Cir. 1999), the signatory filed a petition to compel arbitration in federal court, seeking an order requiring nonsignatories to arbitrate. The court held the nonsignatories bound to an arbitration clause because the clause appeared in an agreement which resulted in the nonsignatories receiving "significantly lower insurance" for their boat and an "ability to sail under the French flag." *Id.* at 353. The court nowhere emphasized the effect on the analysis, if any, of whether or not the nonsignatory had filed suit under the agreement. The dispositive point was that "on the actual facts" the nonsignatories "received

direct benefits" from the contract. *Id.;* cf. *Amkor Tech.*, 278 F.Supp.2d at 523 ("Even if one assumes *arguendo* that [the nonsignatory] did not inject itself into the communications between [the two signatories] the *Tencara* case shows that, so long as a non-signatory has received a direct benefit from a contract, it is not essential that the non-signatory be shown to have interacted regularly with the signatory that seeks to enforce an arbitration clause.").

Thus the court will not grant Human Capital's motion to dismiss on grounds it has not sued under the employee-management agreement. Moreover, not only does it appear that Human Capital might have received direct benefits, but it also allegedly played an important role in the consummation of the agreement and in assisting HC's fulfilling its contractual obligations.

Legacy relies on a district court case from the Ninth Circuit to make the point that when a nonsignatory plays a central role in the effectuation of the underlying agreement's obligations, it is reasonable to hold the nonsignatory to the arbitration clause. See *AHTNA Gov't Servs. Corp. v. 52 Rausch, LLC*, No. 03–00130, 2003 WL 403359 (N.D.Cal. Feb.19, 2003). In that case the court relied on an agency theory, rather than estoppel, to bind the nonsignatory to the clause. *Id.* at *11. As discussed *supra*, in the case at bar, the court is hesitant to extend the agency exception to require a nonsignatory to arbitrate. The court, however, believes that the facts in *AHTNA* would fit the estoppel exception. In *AHTNA* the nonsignatory held itself out as essentially a joint venturer with one of the signatories, agreed to assist in the performance of the contract, and received benefits flowing from the contract. *Id.* The case at bar allegedly involves roughly similar circumstances: Human Capital appears to have held itself out as an affiliate of HC, agreed (through the

management-fee contract) to assist HC in the performance of HC's employee-management agreements, and received direct benefits from the employee-management agreement at issue. Thus, while the *AHT-NA* court relied on agency theory, the case offers support for Legacy's more general point that a nonsignatory cannot participate in the consummation and performance of an agreement, from which the nonsignatory derived benefits, and later avoid the agreement's arbitration clause when a dispute involving the nonsignatory arises.

In sum, even though Human Capital is a nonsignatory which has not sued on the underlying agreement, the court concludes that, based on Legacy's allegations and the two agreements at issue, Legacy may be able to show "direct benefits" estoppel and thus force Human Capital to participate in the Portland arbitration.

### C. Alter Ego

Legacy's petition also alleges that HC acted as Human Capital's alter ego. "Alter ego determinations are highly fact-based, and require considering the totality of the circumstances in which the instrumentality functions." *Bridas S.A.P.I.C.*, 345 F.3d at 359; see also *MAG Portfolio*, 268 F.3d at 63 ("Determining that veil piercing is appropriate is a 'fact specific' inquiry."). Courts generally look at a number of factors to determine whether an alter-ego relationship existed. See, e.g., *MAG Portfolio*, 268 F.3d at 63; *Amfac Foods, Inc. v. International Sys. & Controls Corp.*, 294 Or. 94, 654 P.2d 1092, 1102–03 (1982).

Keeping in mind that Human Capital brought its motion under Rule 12(b), the court will not at this early stage hold that Legacy "beyond doubt" cannot make an alter-ego showing. See *Conley*, 355 U.S. at 45, 78 S.Ct. 99 (observing motion to dismiss should not be granted unless it appears "beyond doubt" that plaintiff can

prove no facts supporting its claim); see, e.g., *MAG Portfolio*, 268 F.3d at 64 (reversing district court's holding that alter-ego exception did not apply because there was "precious little fact finding" on the issue); *Bridas S.A.P.I.C.*, 345 F.3d at 359 ("Because the district court failed to take into account all of the aspects of the relationship between the [parties] it committed an error of law and must reconsider the issue on remand.").

### V. VENUE

██ Human Capital finally argues that Legacy filed its petition in the wrong venue, as Michigan allegedly is the proper venue. Human Capital bases its venue argument on the arbitration provision in the management-fee agreement which specifies Michigan as the proper venue.

The court rejects Human Capital's venue contention. First, the management-fee agreement between HC and Human Capital is not even at issue; the only issue is whether Human Capital is subject to arbitration pursuant to the clause in the employee-management agreement. Moreover the FAA provides that a party may file a petition in "*any* United States district court" which would have jurisdiction over the underlying case. 9 U.S.C. § 4 (emphasis added). Indeed the Ninth Circuit has held that arbitration proceedings must occur in the district where the petition was filed even if the arbitration clause specifies a different state for the arbitration. See *Continental Grain Co. v. Dant & Russell*, 118 F.2d 967, 968 (9th Cir. 1941); see also *Homestake Lead Co. of Mo. v. Doe Run Res. Corp.*, 282 F.Supp.2d 1131, 1138 (N.D.Cal.2003). In sum Oregon is a proper venue.

### VI. CONCLUSION

The court DENIES Human Capital's motion to dismiss (Doc. #9). The court

finds that it has diversity jurisdiction and that the underlying agreement falls within the scope of the FAA. The court further concludes that, under exceptions to the general rule that a nonsignatory may not be compelled to arbitrate, Legacy may be able to show that Human Capital is subject to arbitration.

IT IS SO ORDERED.