DeVORE, J.
*332 In a declaratory judgment action, three counties challenge their obligation to provide their employees paid sick leave as required of many Oregon employers by ORS 653.601 to 653.661. The counties contend that they are excused from the obligation under Article XI, section 15, of the Oregon Constitution, which provides that a local government is not required to comply with a state law that requires a local government to "establish a new program or provide an increased level of service for an existing program" when the state fails to provide adequate funding. The trial court agreed, granted the counties' motion for summary judgment, and entered a judgment that made rulings declaring the paid sick leave law to be an unfunded program. The governor and labor commissioner appeal from that judgment, arguing that the trial court erred in its broad interpretation of Article XI, section 15. We agree, concluding that the paid sick leave law is not an unfunded program of services to others within the meaning of Article XI, section 15. Consequently, the trial court erred in granting the counties' motion and entering a declaratory judgment for the counties. We reverse and remand.[1]
I. BACKGROUND
A. Trial Court Proceedings
Initially, plaintiffs, then nine Oregon counties, filed a complaint in which they alleged that the paid sick leave law compelled them to spend money on a new program or to spend more money for an existing program without any or enough state reimbursement, in violation of Article XI, section 15.[2] They sought a declaratory judgment to that effect and injunctive relief pursuant to ORS 28.020 and ORS 28.080.[3] Defendants, the governor *703 and labor commissioner, *333 responded that the constitutional measure did not apply, adding that, even if the measure applied, all nine counties did not spend more than one-hundredth of one percent of a county's annual budget, which Article XI, subsection 15(3), set as a threshold of applicability.
The parties filed cross-motions for summary judgment. In its initial ruling, the trial court granted plaintiffs' motion and denied defendants' motion. On reconsideration, the court granted plaintiffs' motion in part and denied it in part. The court held that the state's sick leave law was an unfunded program within the meaning of Article XI, section 15, but also determined that plaintiffs had not yet established that the counties met the measure's cost threshold. Thereafter, the parties stipulated that six of the nine counties failed to meet the cost threshold and that their claims should be dismissed in a limited judgment. The parties agreed, however, that Linn, Douglas, and Yamhill counties met the cost threshold. For those three counties, the trial court entered a general judgment declaring that Article XI, section 15, excused them from compliance with the paid sick leave law.
B. The Paid Sick Leave Law
To frame the issue, we describe the statutory and constitutional provisions at issue before recounting the parties' arguments and the trial court's opinion. Enacted by Oregon Laws 2015, chapter 537, the paid sick leave law requires employers of 10 or more employees to implement a sick time policy that allows an employee to earn and use up to 40 hours of paid sick time per year. ORS 653.606(1)(a) ; ORS 653.601(2) (defining "employer").[4] The law is equally *334 applicable to private and public employers, specifically including cities, counties, various districts, and other public entities. ORS 653.601(2). Employers may adopt policies limiting employees' accrual of sick leave to 80 hours and permitting use of no more than 40 hours per year. ORS 653.606 (3)(a), (b). Sick leave may be used for an employee's "mental or physical illness, injury or health condition, need for medical diagnosis, care or treatment of a mental or physical illness, injury or health condition or need for preventative medical care," or for care of a family member with those needs. ORS 653.616(1), (2). An employer may, but is not required to, direct an employee to provide verification from a health care provider of the need for sick time or certification of the need for family leave, when the employee uses sick leave for more than three consecutive days, ORS 653.626(1)(a), but the employer must pay reasonable costs, if any incurred for providing the verification or certification, ORS 653.626(2). The sick leave law does not affect any employer policy or standard that provides for a greater use of paid or unpaid sick time. ORS 653.636. And, the sick leave law does not apply to employees subject to collective bargaining agreements or consumer-employed home-care workers whose sick time policy is established by the Home Care Commission. ORS 653.646(1), (2). The parties agree that the legislature did not appropriate funds to local governments or private employers to implement paid sick leave.
C. The Unfunded Programs Measure
The unfunded programs measure, section 15 of Article XI of the Oregon Constitution, was originally adopted by Oregon voters in 1996 as Ballot Measure 30 after a legislative referral in the preceding year. House Joint Resolution (HJR) 2, para. 1 (sec. 15) (1995); Oregon Laws 1997, ix (Vote on Statewide Measures, Nov. 5, 1996, Measure 30 (HJR 2)). Because the original measure included a sunset provision, HJR 2, para. 1 (section 15a), the measure was resubmitted and readopted by voters in 2000 as Ballot Measure 84.
*335 Oregon Laws 2001, x (Vote on Statewide Measures, Nov. 7, 2001, Measure 84 *704 (Senate Joint Resolution (SJR) 39 (2001)). Article XI, section 15, provides:
"(1) Except as provided in subsection (7) of this section, when the Legislative Assembly or any state agency requires any local government to establish a new program or provide an increased level of service for an existing program , the State of Oregon shall appropriate and allocate to the local government moneys sufficient to pay the ongoing, usual and reasonable costs of performing the mandated service or activity.
"(2) As used in this section:
"(a) 'Enterprise activity' means a program under which a local government sells products or services in competition with a nongovernment entity.
"(b) 'Local government' means a city, county, municipal corporation or municipal utility operated by a board or commission.
"(c) 'Program ' means a program or project imposed by enactment of the Legislative Assembly or by rule or order of a state agency under which a local government must provide administrative, financial, social, health or other specified services to persons, government agencies or to the public generally .
"(d) 'Usual and reasonable costs' means those costs incurred by the affected local governments for a specific program using generally accepted methods of service delivery and administrative practice.
"(3) A local government is not required to comply with any state law or administrative rule or order enacted or adopted after January 1, 1997, that requires the expenditure of money by the local government for a new program or increased level of service for an existing program until the state appropriates and allocates to the local government reimbursement for any costs incurred to carry out the law, rule or order and unless the Legislative Assembly provides, by appropriation, reimbursement in each succeeding year for such costs. However, a local government may refuse to comply with a state law or administrative rule or order under this subsection only if the amount appropriated and allocated to the local government by the Legislative Assembly for a program in a fiscal year:
*336 "(a) Is less than 95 percent of the usual and reasonable costs incurred by the local government in conducting the program at the same level of service in the preceding fiscal year; or
"(b) Requires the local government to spend for the program, in addition to the amount appropriated and allocated by the Legislative Assembly, an amount that exceeds one-hundredth of one percent of the annual budget adopted by the governing body of the local government for that fiscal year.
"* * * * *
"(7) This section shall not apply to:
"(a) Any law that is approved by three-fifths of the membership of each house of the Legislative Assembly.
"* * * * *
"(8) When a local government is not required under subsection (3) of this section to comply with a state law or administrative rule or order relating to an enterprise activity, if a nongovernment entity competes with the local government by selling products or services that are similar to the products and services sold under the enterprise activity, the nongovernment entity is not required to comply with the state law or administrative rule or order relating to that enterprise activity."
(Emphases added.) In light of those provisions, the question in the trial court and on appeal is whether the paid sick leave law constitutes a "program" that requires "a local government" to "provide * * * services to persons, government agencies, or the public generally." Or. Const, Art XI, §§ 15 (1), (2)(c).
D. Trial Court's Opinion
In reaching its decision, the trial court expressed some ambivalence about the measure's definition of "program," which includes the word "program" as part of the definition. The court declared that it "must disregard the use of the term program in defining program since it is of no help." Although the court agreed with the counties' proffered dictionary *705 definitions of "program" and "services," the court noted that "dictionary definitions differ and lack *337 the specificity that would resolve the question." Rather, the court deemed the other parts of the definition of "program," what it called the "criteria for [a] program," to be "clear and unambiguous," such that the term "program" should apply to the paid sick leave law.
The trial court found support in several places. The court was persuaded that the legislative history of two competing referral resolutions in 1995 indicated that persons favoring and opposing the resolutions "clearly believed" that employee benefits could or would fall within them. Finally, the court noted an attorney general's opinion that was rendered after the voters' initial adoption of the constitutional measure in 1996 but before their re-adoption of the measure in 2000. That opinion, while recognizing room for doubt, advised that a proposal for increased benefits in the Public Employee Retirement System could be subject to the unfunded program measure. 49 Op. Atty. Gen. 152 (1999).
Putting it all together, the trial court concluded that the paid sick leave law is a "program" that requires the three plaintiff counties, as employers, to provide "services" to persons, agencies, or the public in general, without required funding, contrary to Article XI, section 15.
E. Arguments
On appeal, defendants assign as error the trial court's decisions to grant plaintiffs' motion for summary judgment and to enter a judgment with plaintiffs' requested declaratory rulings. Defendants argue that the paid sick leave law is not a "program" for providing government services to others. In defendants' view, paid sick leave is merely a component of employee compensation within local government or any public or private organization. Defendants argue that the terms "program" and "service" must be considered in the context of the unfunded program measure. When so considered, the terms "program" and "services" refer "to various kinds of services that local governments perform." Defendants add that their view is supported in the measure's referral history. They argue that the voters' pamphlets in 1996 and 2000 reveal nothing to suggest something like the paid sick leave would be considered an unfunded *338 program, while the legislature's choice to refer a narrower measure, rather than a broader measure, to the voters suggests that a "program" means a governmental program of services to individuals or to the public in general.
Plaintiffs argue that Article XI, section 15, is not restricted to just unfunded government programs imposed on local governments. Plaintiffs argue that the constitutional measure applies not to government programs in the traditional sense, but to all "laws of general application" to everyone, including local governments. Like defendants, plaintiffs refer to the measure's history in competing referral resolutions in the legislature. Plaintiffs point to witness exhibits showing some surveyed public entities had listed employee matters such as workplace safety or arbitration in collective bargaining as "unfunded mandates." In further support of their argument, plaintiffs point to subsection 15(8), which provides that, when a local government's "enterprise activity" is relieved of a requirement by the unfunded programs measure, then any private entity that competes by selling products or services is likewise relieved of compliance with such a state requirement. Plaintiffs infer that subsection 15(8) would be unnecessary if Article XI, section 15, did not apply to all laws in general.
II. DISCUSSION
A. Approach
We review to determine if the trial court correctly concluded that there was no genuine issue of material fact and that the moving party was entitled to judgment as a matter of law. ORCP 47 C. We view the evidence, including all reasonable inferences, in the light most favorable to the nonmoving party. Jones v. General Motors Corp. , 325 Or. 404, 408, 939 P.2d 608 (1997). Where, as here, parties file cross-motions for summary judgment, "the summary-judgment record *706 'consists of documents submitted in support of and in opposition to both motions.' " WSB Investments, LLC v. Pronghorn Devel. Co., LLC , 269 Or. App. 342, 355, 344 P.3d 548 (2015) (quoting Citibank South Dakota v. Santoro, 210 Or. App. 344, 347, 150 P.3d 429 (2006), rev. den., 342 Or. 473, 155 P.3d 51 (2007) ). *339 In this case, the parties do not assert that there are issues of material fact, and the question presented is an issue of law. That question requires us to interpret a constitutional amendment that was twice adopted by the voters after an initial legislative decision in a choosing between two referral resolutions. "We interpret referred constitutional amendments within the same basic framework as we interpret statutes[.]" State v. Sagdal , 356 Or. 639, 642, 343 P.3d 226 (2015). That requires looking at the text, context, and legislative history of the amendment to determine the voters' intent. Id. at 642-43, 343 P.3d 226. " 'The best evidence of the voters' intent is the text and context of the provision itself[.]' " Id. at 642, 343 P.3d 226 (quoting State v. Harrell/Wilson , 353 Or. 247, 255, 297 P.3d 461 (2013) (bracket in Sagdal )). Context for a referred constitutional amendment includes preexisting constitutional provisions, case law, and statutory overlay. State v. Vallin, 364 Or. 295, 304, 434 P.3d 413, adh'd to on recons. , 364 Or. 573, 437 P.3d 231 (2019) ; Sagdal , 356 Or. at 642, 343 P.3d 226.
"[C]aution must be used before ending the analysis at the first level, viz. , without considering the history of the constitutional provision at issue." Sagdal , 356 Or. at 642, 343 P.3d 226 (internal quotation marks omitted). That history includes "sources of information that were available to the voters at the time the measure was adopted and that disclose the public's understanding of the measure, such as the ballot title, arguments included in the voters' pamphlet, and contemporaneous news reports and editorials." Id . at 642-43, 343 P.3d 226 (internal quotation marks omitted). However, we must approach cautiously reliance on advocates' statements during a measure's enactment, "because of the partisan character of such material." Id . at 643, 343 P.3d 226. Moreover, as a legislative referral, we recognize that the constitutional amendment was "drafted by the legislature, acting in its capacity as the collective representative of the people." State v. Lane , 357 Or. 619, 634, 355 P.3d 914 (2015). In this case, it warrants mention that
"[t]hose proposed amendments are then subject to the hearings and deliberations that are part of that process and, if approved by the legislature, referred by the Secretary of State to the voters. That legislative deliberation is part of the constitutionally mandated adoption process. It is *340 conducted in public, and its records are available to the public. Although the measure that the legislature refers becomes effective only if ultimately approved by the voters, the voters have the opportunity to give their approval only after the legislature drafts a measure and, after deliberation, deems it worthy of submission to them. Under the circumstances, the legislature's deliberations seem no less worthy of consideration than the deliberations of a legislative committee in referring a bill to the floor of the House or the Senate."
Id . ; see also Ecumenical Ministries v. Oregon State Lottery Comm. , 318 Or. 551, 559, 871 P.2d 106 (1994) (considering enactment history if helpful). We are mindful that the "weight that the courts will accord a particular bit of enactment history will depend on the circumstances-including the clarity with which the legislature's or the people's intentions have been expressed in the text of an enactment and the nature of the history itself." Lane , 357 Or. at 634, 355 P.3d 914.
Accordingly, we consider, in turn, the text of the provision at issue, the context of those terms in the measure, the meaning of relevant terms in a larger statutory or constitutional context, voters' pamphlets, and the measure's referral history in the legislature. Next, we discuss the enterprise provision, and the confusion surrounding "unfunded mandates." After considering those things, we conclude that Article XI, section 15, does not apply to the statutes on paid sick leave.
B. Text and Context
The meaning of Article XI, section 15, is evident in its text and context. Subsection *707 (1) provides that, when the state "requires any local government to establish a new program or provide an increased level of service for an existing program," the state must provide a local government "moneys sufficient to pay the ongoing, usual and reasonable costs of performing the mandated service or activity." Subsection (3) provides that, when the state fails to provide sufficient moneys, a "local government is not required to comply with any state law * * * that requires the expenditure of money by the local government for a new program or increased level of service for an existing program." Paragraph (3)(b) sets the *341 financial threshold for noncompliance, which three plaintiffs meet.
Article XI, section 15, defines "program." As quoted before, subsection (2) defines a "program" as
"a program or project imposed by enactment of [the state] * * * under which a local government must provide administrative, financial, social, health or other specified services to persons, government agencies or to the public generally."
Because the definition of "program" uses the same word as a part of its definition, it leaves the word to be given meaning by the immediate context of related elements and by the larger context of other provisions or statutes. The immediate context describes what sort of a "program" is subject to Article XI, section 15. A "program" must have four elements (i.e. , "criteria" in the trial court's terminology). First, it must be a "program" imposed by an enactment of the state. Second, the program must be imposed on local government. Third, the enactment must be a new program provided by local government or a requirement of increased services for an existing program. And, fourth, the enactment must require local government to provide services to individuals, agencies, or the public at large.
We note that "[d]ictionary definitions lack context and often fail to capture the nuanced connotations conveyed by the normal use of a term in a particular context." State v. Gonzalez-Valenzuela , 358 Or. 451, 461, 365 P.3d 116 (2015). That is certainly true when taking the term "program" out of the context of a provision on state and local government relations. Nevertheless, one general definition of "program" is "a plan of procedure : a schedule or system under which action may be taken toward a desired goal." Webster's New Third Int'l Dictionary 1812 (1993). Such a generic definition is not wholly inappropriate; that definition is true of the "programs" by means of which local governments take action toward the goal of providing services.
The immediate context of "program" within Article XI, section 15, reinforces that understanding of the nature of the word. Subsection (1) refers to the "usual and reasonable costs of performing the mandated service or activity."
*342 Paragraph (2)(c) defines "program" as something local governments do "to provide administrative, financial, social, health or other specified services * * *." And paragraph (2)(d) defines usual and reasonable costs using the term "service delivery ," which contemplates delivering services. Those terms suggest that a "program" involves actively doing something to perform, provide, or deliver services to others.
When the definition of "program" is seen in that context of Article XI, section 15, we can make preliminary observations about the meaning and purpose of the measure. Article XI, section 15, is written with specific reference to the protection of "local governments," not all employers. Its bane is a state law that imposes on local governments unfunded "programs," not necessarily all laws that simply have a financial impact on everyone. As used in context here, "programs" are the means by which local governments actively provide services to individuals, agencies, or the public generally. That is, "programs" provide services to others . Therefore, "programs" would not appear to mean matters of internal administration or management within a local government itself.
From its text and context, we draw a different conclusion than plaintiffs about Article XI, section 15. By its own terms, Article XI, section 15, is not addressed to all ordinary laws of general application, such as ones involving employee relations in businesses at large. Rather, Article XI, section 15, addresses *708 state enactments that require unfunded government programs to actively perform, provide, or deliver services to others. Because the measure exists to regulate the relations between state and local government by controlling unfunded public services, "program" in Article XI, section 15, is necessarily understood to mean a governmental program.
C. Preexisting Framework
We recognize that the measure's terms can also draw meaning from the context provided by, among other things, preexisting constitutional provisions and the statutory framework existing when the measure is adopted. Sagdal , 356 Or. at 642-43, 343 P.3d 226. Reference to "program" in other constitutional and statutory provisions provides helpful *343 context, and, consistently, that context indicates that "program" is used in the sense of government programs.
The implication that "program" means government programs is strongest in a provision of Oregon statutes that is the financial heart of local governments. That is the Local Budget Law, ORS 294.305 to 294.565. Its use of the term "program" is likely the same as the issue in this case, because Article XI, section 15, and the Local Budget Law both concern finances in local government. Specifically, ORS 294.311(33) provides:
" 'Program' means a group of related activities aimed at accomplishing a major service or function for which the municipality is responsible ."
(Emphasis added.) In that definition, a "municipality" is a term that expressly includes any county, city, school district, public utility or public corporation. See ORS 294.311(26) (defining "municipal corporation"). In that context, a "service or function for which [local government] is responsible" necessarily means the traditional governmental programs for services such as police, fire suppression, road maintenance, public education, water, sewer, electricity, or even telecommunications. See, e.g., GTE Northwest Inc. v. PUC , 179 Or. App. 46, 39 P.3d 201, rev. den. , 334 Or. 492, 52 P.3d 1057 (2002) (county was authorized to provide telecommunication services to its residents and those outside its geographical borders); see generally Or. Const, Art. XI, § 2 (city home rule); Or. Const., Art. VI, § 10 (county home rule); ORS 203.035 (statutory county "home rule").
That meaning of "program," as a government program, is also reflected in another statute, although the context is state government. State agencies are required by ORS 291.373(2) to report to the legislature "any substantive change made in a program administered by the state agency." In relevant part, ORS 291.373(1)(b) provides that " 'Program' means an activity or a series of related activities that a state agency performs to fulfill its constitutional or statutory duties ." (Emphases added.) As in the Local Budget Law, a "program" means doing those activities which the agency exists to perform as a public agency. Again, "program" means government program.
*344 The same meaning is apparent in miscellaneous provisions of the Oregon Constitution. For example, the legislature is required by Article XV, section 4b(3)(d), to appropriate moneys from the parks and natural resources fund, among other things, to "[s]upport local delivery of programs or projects, including watershed education activities, that protect or restore native fish or wildlife habitats or watersheds." (Emphasis added.) Similarly, Article XV, section 4c, requires agencies that receive money from the fund to submit a report to the legislature "that describes the measurable biennial and cumulative results of activities and programs financed by the fund." (Emphasis added.) Likewise, Article XV, section 4f(2), provides that the legislature may appropriate moneys from the State Lottery for services to military veterans including "[a]ssistance for veterans with reintegration, employment, education benefits and tuition, housing, physical and mental health care and addiction treatment programs ." (Emphasis added.) The constitution's use of the term "program," like Oregon statutes, refers to government programs that provide public services, whether those services are provided to individuals or to the public at large.
With that said, we have little difficulty in concluding that the text and context of Article XI, section 15, indicate that "program"
*709 concerns what is traditionally understood as government programs, i.e. , the provision of public services to others. The paid sick leave law, on the other hand, when applied to local governments, concerns matters of internal administration or management. The counties and the trial court, however, have reached a contrary conclusion from the measure's enactment history. We turn to that history to explain why it does not dissuade us from concluding that the paid sick leave law does not fall within the ambit of Article XI, section 15.
D. Voters' Pamphlets
If, in 1996, the voters had intended Ballot Measure 30 to reach laws of general application that happen to impact local governments, such as internal matters of personnel management, that intent was not announced in the Voters' Pamphlet that voters considered. The "Explanatory *345 Statement," drafted by legislative committee, said, "Measure 30 amends the Oregon Constitution to require state financing of state programs imposed on local governments after January 1, 1997." Official Voters' Pamphlet, General Election, Nov. 5, 1996, 23 (emphasis added). In the "Legislative Argument in Support," several legislators explained:
"Currently, the state government or a state agency may compel a local government to provide financial, social, health and other services to the public , but does not have to provide any money to the local government to pay the cost of those services.
"* * * * *
"Measure 30 eliminates the power of state government and state agencies to demand that local money be used to pay for state required programs ."
Voters' Pamphlet at 24 (statement of Sen. Bob Kintigh, House Speaker Bev Clarno, Rep. Ken Strobeck (emphases added)). The Speaker of the House of Representatives wrote:
"Have you ever wanted to tell state government to be accountable? To stop passing the buck to someone else?
"That's what Ballot Measure 30 is all about. It's an opportunity to tell state government that, if you're going to require local government to do a job , the state is going to have to pay the bill. It's that simple."
"* * * * *
"Ballot Measure 30 simply says that if the state says to counties and cities that they have to provide a service , the state has to foot the bill. If the state is not paying the price, the county or city can decline to provide the service ."
Id. at 25 (statement of Speaker Bev Clarno (emphases added)). Two statements referred more generally to "unfunded mandates" and to analogous legislation by Congress.[5]
*346 Id. at 26-27 (statement of Richard Allen, Dale White, Steve McClure; statement of Randall Franke). If the statements evidence anything, they express concern for state-mandated "programs" that require a local government "to do a job" or to provide "services to the public." As such, the statements indicate a concern about state laws that require unfunded government "programs" for "services" to others, not a concern about the financial impact of general laws on the management within organizations-whether they be public or private.[6]
*710 In 2000, the statements in the Voters' Pamphlet were similar.[7] The "Explanatory Statement" said, " Section 15, Article XI of the Oregon Constitution, requires the state to pay for services that the state requires local governments to provide." Voters' Pamphlet at 8. The "Legislative Argument in Support" advised:
*347 "Measure 84 preserves the voter-approved constitutional requirement for state government to pay for services that it requires local governments to provide.
"* * * This section of the Constitution states that, if state government requires a local government to provide new or additional services , then state government must also provide the additional funding to support those services . If the state does not provide the funds, the local government is not required to provide the service ."
Official Voters' Pamphlet, General Election, Nov. 7, 2000, 9 (statement of Sen. Lee Beyer, Rep. Richard Devlin, Rep. Kevin Mannix (emphases added)). Two proponents wrote, "An unfunded mandate occurs when the state requires the county to perform tasks and does not provide funding to pay for it." Id. at 12 (statement of Jack Walker and Ric Holt (emphasis added)). As before, such statements refer to requirements that local government provide "services" or "perform tasks" for others in the traditional sense of unfunded government programs. Those statements confirm our understanding that the concern behind Measures 30 and 84 was the unwanted delegation to local governments of unfunded programs that must serve individuals or the public at large.
E. Referral History
The history of the legislative referral that became Article XI, section 15, reflects, on one hand, a conceptual confusion about the meaning of "unfunded mandates" and, on the other hand, a significant choice between two proposed measures with differing language. When a House committee opened the first public hearing, the committee had before it both HJR 2, which became Measure 30, and House Joint Resolution 17 (HJR 17), which died in committee. Minutes, House Committee on General Government and Regulatory Reform (House Committee), Mar. 2, 1995, 1 (listing matters heard); Tape Recording, House Committee, HB 3370, Mar. 2, 1995, Tape 56, Side A at 376-387 (statement of committee counsel Anne Tweedt). HJR 2 contained the adopted language defining a "program" as a "program or project imposed by enactment of the [state] * * * under which a local government must provide * * * services to *348 persons, government agencies or the pubic generally." HJR 17 inserted additional words that defined a program as "any program, procedure , project, or responsibility imposed by enactment" of the state.[8] (Emphases added.)
Richard Townsend, on behalf of the Oregon League of Cities, presented responses to an "Unfunded Mandates Survey," in which *711 responding cities identified their top five "unfunded mandates" on a form. Exhibit L, House Committee, HB 3370, HJR 2, & HJR 17, Mar. 2, 1995 (accompanying statement of Richard Townsend). There is no indication that respondents were told what an "unfunded mandate" was, and it appears that they responded accordingly. Id . Among the broad range of responses were "unfunded mandates" such as the Americans with Disabilities Act (making improvements), id. at 2, 9; the Occupational Safety and Health Act (staffing needed; costs; too many rules), id. at 2, 6, 12, 13; comprehensive statewide planning (doing land use plans; lack of expertise; doing periodic reviews), id. at 4, 10, 14; firefighter safety and training, id . at 6; public employee collective bargaining (specifically, mandatory arbitration), id at 8, 13; public contracting statutes, id. ; health insurance for retired employees, id. ; water meter installation, id. at 9; and administration of building codes, id. at 12. See also Exhibit C, House Committee, HB 3370, HJR 2, & HJR 17, Mar. 17, 1995 (League of Cities Memo listing, among other local services that might be affected by HB 3370, employee benefits, collective bargaining, local budget law, public contracting law, some ethics laws, land use programs, building code enforcement, and public safety).
Townsend testified that the word "mandate" had become a "buzz word," and that there were "many different kinds of mandates." Exhibit L, House Committee, HB 3370, HJR 2, & HJR 17, Mar. 2, 1995, 1 (written testimony of Richard Townsend). He identified 11 categories or "definitions of mandates," including "personnel mandates," relating *349 to hours and benefits, "ethical mandates," "promoting high moral standards in public service," and "service level mandates," requiring local services to meet minimum standards. Id . at 3. Townsend said that the joint resolutions before the committee address "only some of these types of mandates," involving "the funding of mandated programs and services ." Id. at 1 (emphases added). Townsend, a principal witness, recognized that HJR 2 addressed what he called "service level mandates," rather than "personnel mandates."
In response to two county commissioners who testified in support of the proposals, vice chair Lehman posited that everything the legislature does has some impact or cost to the counties or someone else. He asked:
"[A]re we going to get into a nit-picking situation here where every time we do something you disagree with, you are going to say that it's going to cost us 10 minutes a month to do this and that's an unfunded mandate and we're not going to do it. And how do we keep that perspective and that balance so we don't end up in a constant battle between state, and local, and probably federal governments as to what's an unfunded mandate and what is a reasonable requirement to pass on to another entity?"
Tape Recording, House Committee, HB 3370, HJR 2, & HJR 17, Mar. 2, 1995, Tape 56, Side B at 122-134. The witness, Rocky McVay, from the Oregon Association of Counties, responded that the answer would require "communication, cooperation, and consideration." Id . at 134. After further testimony, Representative Strobeck posed the same question to Townsend, eliciting a similar response:
"[Rep. Strobeck]: What kind of assurance do we have that if something like this goes forward, that you're not going to come back and say, well, the state would like to have this occur therefore we are going to start calling this a mandate and request funding for it? How is that going to work?"
"[Townsend]: I would assume that two intelligent people could probably either figure out whether it is or isn't [a mandate]. Or. if it is a state law, I would assume it will receive enough scrutiny that there would probably be agreement. And if there isn't and the state says it's not a mandate, then it's probably not."
*350 Tape Recording, House Committee, HB 3370, HJR 2, & HJR 17, Mar. 2, 1995, Tape 57, Side B at 234-42.
On a different matter, a spokeswoman for Portland General Electric expressed concern that privately owned utilities might be subject to unfair competition if publicly owned utilities, in their offer of products or services, *712 were freed from compliance with "unfunded mandates." She asked that the same consideration be given private businesses competing with public enterprises.[9] Exhibit N, House Committee, HB 3370, HJR 2, & HJR 17, Mar. 2, 1995 (statement of Denise McPhail). The potential for a mandate that affected competing private and public enterprises was not further explored nor critically examined. See Tape Recording, House Committee, HB 3370, HJR 2, & HJR 17, Mar. 2, 1995, Tape 57, Side B at 348 to end (presentation of PGE representative Denise McPhail); Tape Recording, House Committee, HB 3370, HJR 2, & HJR 17, Mar. 17, 1995, Tape 74, Side A at 8-38 (amendments made). Nevertheless, the concern for unfair competition was the genesis of subsection 15(8) of Article XI, which exempts private business from whatever enactment might free competing public businesses from an enactment requiring an unfunded service program. Tape Recording, House Committee, HB 3370, HJR 2, & HJR 17, Mar. 17, 1995, Tape 74, Side A at 8-38.
In a later work session, committee counsel Tweedt pointed out that HJR 2 defined a "program" differently than HJR 17, which included the word "responsibility." As for HJR2, she suggested that "new programs" or increased service levels in programs was easy enough to define. Tape Recording, House Committee, HB 3370, HJR 2, & HJR 17, Mar. 17, 1995, Tape 74, Side A at 8-38, 57-84 (advice of Anne Tweedt).
Later, Representative Lehman asked if the state banned herbicide throughout the state and the herbicide-alternative costs more money, would a city with a municipal *351 golf course have the option to disregard the law. Tweedt responded that the question "comes down to the definition of program." That would be a question whether it is a new program or level of service. She advised the committee that a city could not disregard such a state requirement because that would not be a new program or increased level of service. Tape Recording, House Committee, HB 3370, HJR 2, & HJR 17, Mar. 17, 1995, Tape 73, Side B at 117-138.
Ultimately, the House committee approved HJR 2 with its definition of "program" (the definition at issue), and the committee chose not to recommend HJR 17 with its added terms in the definition of "program" (i.e. , "any program, procedure , project, or responsibility imposed by enactment").[10] The House and Senate approved HJR 2.[11] HJR 2 became Measure 30 that voters adopted in 1996.[12]
From the referral history, we observe that the legislature avoided the abstract term "responsibility" and chose the concrete term, "program," a term that is well understood in the public sector. And, we note that, when explaining HJR 2 to the drafting committee, its counsel advised that a statewide herbicide ban affecting a city golf course would not be a law imposing an unfunded government "program" for services. In other words, such a law would only be a law of general applicability. In short, we reject plaintiffs' arguments that the enactment history of Article XI, section 15, indicates that the measure is a limitation on anything other than state enactments that impose on local governments unfunded government programs to perform, provide, or deliver services to others.
F. The Enterprise Provision
As noted, plaintiffs argue that, if Article XI, subsection 15(8), is necessary to protect private enterprises who compete with public enterprises in providing products and *352 services, then Article XI, section 15, must *713 be understood to address all laws of general application as well as to those particular laws directed toward local governments. We consider plaintiffs' inference to be too great a leap. Referral history shows that the enterprise provision at subsection 15(8) arose from a specific concern about unfair competition between privately owned and publicly owned enterprises, particularly utilities. The concern had little discussion and drew no critical examination of whether a state enactment or rule, with the criteria described in Article XI, section 15, would reach both a publicly owned enterprise and a privately owned enterprise.
In any case, matters involving competing enterprises like utilities involve unique or specialized relationships between the public and private sectors. See, e.g. , PacifiCorp v. City of Ashland , 88 Or. App. 15, 744 P.2d 257 (1987), modified on recons. , 89 Or. App. 366, 749 P.2d 1189, rev. den. , 305 Or. 594, 754 P.2d 579 (1988) (involving conflict between the service areas of public and private utilities); Columbia River People's Utility Dist. v. Portland General Electric , 40 F.Supp.2d 1152 (D. Or. 1999) (background of dispute included Public Utility Commission grant of exclusivity). As such, competing public and private enterprises like utilities are a unique subset of a much larger and varied world of business. To imagine that drafters and voters envisioned Measure 30 to involve laws directed at all businesses or the public at large is neither supported by any comments in the referral history nor the voters' pamphlets. Plaintiffs' inference, drawn from subsection 15(8), is contrary to other indications of the measure's meaning and is not reasonable. The reasonable inference is that the legislature acted in a precautionary way to safeguard competing private enterprises from unfair competition from public enterprises, if any. That, and nothing more, explains subsection 15(8).
G. Confusion About "Unfunded Mandates"
From the referral history of Article XI, section 15, we recognize the conceptual confusion in the statements and exhibits from legislative witnesses who spoke in broad terms of "unfunded mandates" as things that ranged from any requirements of law, even in an entity's own conduct *353 (e.g. , labor arbitration, ethics standards, or public contracting statutes) to programs for services to the public (e.g. , water meter installation).[13] Such witness statements, with little engagement with the particular words employed, are the least helpful indications of the meaning of a measure's terms. See Sagdal , 356 Or. at 642-43, 343 P.3d 226 ("[W]e are cautious in relying on statements of advocates, such as those found in the voters' pamphlet, because of the partisan character of such material.").
The same conceptual confusion is evident in the hedged opinion of the attorney general, on which plaintiffs and the trial court relied. See 49 Op. Atty. Gen. 152 (1999) (opining that, "although the issue is not without doubt," proposed legislation for an increase in PERS benefits could implicate the unfunded programs measure).[14] The same confusion is evident in several ways. The opinion failed to fully appreciate the two differing measures then before the 1995 house committee at the time the witnesses testified; the opinion relied on advocates speaking loosely of "unfunded mandates" without a common understanding of the meaning of the term; the opinion did not appreciate the more limited *714 language adopted by the legislature and voters; the opinion did not examine text in its immediate context; and the opinion did not relate the term "program" to the preexisting statutory framework. At oral argument in this case, the Department of Justice, representing the *354 defendants, expressly disavowed that prior opinion, although it acknowledged that the opinion has not been withdrawn. Ultimately, however, the opinions of the attorney general do not bind the court, especially when the present attorney general expresses views contrary to those of her predecessor. See Alexander v. Gladden , 205 Or. 375, 383-84, 288 P.2d 219 (1955) (so stating); Felkins v. Department of Revenue , 5 Or. Tax 475, 478 (1974) (state's answering brief effectively "overruled" the prior published opinion of the attorney general).
Conceptual confusion about "unfunded mandates" continues on, appearing in this litigation in the parties' arguments about the meaning of terms. That confusion is most evident when plaintiffs contend that Article XI, section 15, addresses any law of general application to all Oregon entities, public and private alike, even if the enactment does not require that government programs furnishing services to individuals or the public. That confusion is no longer warranted.
III. CONCLUSION
We conclude that Article XI, section 15, concerns state enactments that require unfunded government programs to perform, provide, or deliver services to individuals, agencies, or the public at large. The paid sick leave law, ORS 653.601 to ORS 653.661, is not a "program" for government services to others within the meaning of the unfunded programs measure. Consequently, the trial court erred in granting plaintiffs' motion for summary judgment and entering a judgment with the declaratory rulings requested by plaintiffs. That judgment is reversed and remanded.
Reversed and remanded.

Because defendants did not assign error to the denial of their cross-motion for summary judgment, which is essentially the converse of plaintiff's motion, our decision speaks in terms of the ruling on plaintiffs' motion, leaving appropriate proceedings to the trial court on remand.

The nine counties were Linn, Douglas, Jefferson, Malheur, Morrow, Polk, Sherman, Wallowa, and Yamhill counties.

Pursuant to ORS 28.020,
"[a]ny person interested under a deed, will, written contract or other writing constituting a contract, or whose rights, status or other legal relations are affected by a constitution, statute, municipal charter, ordinance, contract or franchise may have determined any question of construction or validity arising under any such instrument, constitution, statute, municipal charter, ordinance, contract or franchise and obtain a declaration of rights, status or other legal relations thereunder."
Pursuant to ORS 28.080, the court may grant further relief whenever necessary and proper.

In relevant part, ORS 653.601(2) provides:
"(a) Employer' means any person that employs one or more employees working anywhere in this state, a political subdivision of the state and any county, city, district, authority, public corporation or entity, and any instrumentality of a county, city, district, authority, public corporation or entity, organized and existing under law or charter.
"* * * * *
"(c) 'Employer' does not include the federal government."

In March 1995, Congress had enacted the Unfunded Mandates Reform Act. Pub. L. 104-4, 109 Stat. 48 (1995), codified as 2 USC §§ 1501 -1571. Among other things, it declared its purposes included
"to end the imposition, in the absence of full consideration by Congress, of Federal mandates on State, local, and tribal governments without adequate Federal funding, in a manner that may displace other essential State, local, and tribal governmental priorities[.]"
2 USC § 1501(2). With some specific exclusions, the law defined a "Federal mandate" as
"any provision in statute or regulation or any Federal court ruling that imposes an enforceable duty upon State, local or tribal governments including a condition of Federal assistance or a duty arising from participation in a voluntary Federal program."
2 USC § 1555 (emphasis added); see 2 USC § 1503 (exclusions). Those terms of the federal law were not published or discussed in either of the Voters' Pamphlets in 1996 and 2000.

One opponent expressed concern that
"Ballot Measure 30 contains a host of clauses, conditions and exemptions having to do with state mandates. It leaves open the opportunity for court fights, interpretations, and long debates over the meaning of mandate[s]. It complicates state law and the interaction between the state and other jurisdictions."
Voters' Pamphlet at 28 (statement of Ken Allen).

One opponent of Measure 84 came closer to referring to employment circumstances. He wrote:
"Important issues are at stake, from clean air or water standards, to minimum standards for road or building construction, to safety and health for workers on the job . Major efforts to protect the quality of life and business climate in Oregon should not be undermined.
"Measure 84 makes it difficult to set new policy in this state and require all government jurisdictions within the state to enforce these new policies."
Official Voters' Pamphlet, General Election, Nov. 7, 2000, 13 (statement of Sen. Tony Corcoran (emphases added)). The statement, however, does not focus narrowly on the health and safety standards of employees of local governments themselves. Rather, the statement appears to be directed at preservation of road, building, safety, and health policies that local governments are required "to enforce" among the larger public.

In addition, the committee had before it House Bill (HB) 3370, which was proposed as a statutory enactment of the provisions of HJR 2. See Minutes, House Committee, Mar. 2, 1995, 1 (listing matters heard). It would have been effective without the vote of the people at the general election. Its essential terms were substituted into House Bill (HB) 3222. The legislature approved HB 3222, but the governor vetoed the bill. 1995 House Journal, H-201 (proceedings on HB 3222), HLS-2 (table of vetoed house bills).

Denise McPhail, the PGE spokeswoman, warned that "without some modification this could be some unintended consequences. It is not just utilities, you have municipal golf courses, you have private and publicly funded ambulance companies, landfills, hospitals * * *." Tape Recording, House Committee, HB 3370, HJR 2, & HJR 17, Mar. 2, 1995, Tape 57, Side B, at 8-38 (statement of Denise McPhail).

Tape Recording, House Committee, Apr 20, 1995, Tape 104, Side A at 153 (as to HJR 2, recommending "do pass"); 1995 House Journal H-258 (HJR 2), H-261 (HJR 17).

1995 House Journal H-258 (HJR 2), HLS-2 (HJR 2, measures referred to the people); 1995 Senate Journal H258-59 (HJR 2).

Oregon Laws 1997, ix (Vote on Statewide Measures, Nov. 5, 1996, Measure 30 [HJR 2] ).

In the federal debate, which preceded HJR 2 and Measure 30, the concept of "unfunded mandates" grew out of the "Contract with America," urged by Representatives Newt Gingrich and Dick Armey. Julie Roin, Reconceptualizing Unfunded Mandates and Other Regulations , 93 N.W. U. L. Rev. 351 n. 7 (1999) (discussing the Unfunded Mandates Reform Act of 1995, Pub. L. No. 104-4, 109 Stat. 48 ); see also Daniel H. Cole, Rhetoric, Reality, and the Law of Unfunded Federal Mandates , 8 Stan. L. & Pol'y Rev. 103 (1997) (examining the financial reality of federal mandates).

The attorney general's opinion observed that "[n]othing in the 1995 Voters' Pamphlet indicates whether the measure was intended to apply to local governments' personnel obligations * * *." 49 Op. Atty. Gen. at 154. And, the opinion allowed that
"the voters may have intended the word 'service' to include only those functions performed in a local government's capacity as a governmental entity, and not those performed in its capacity as an employer."
Id . But, the opinion added, "Nothing in this definition expressly limits 'program' services to activities performed in a governmental capacity." 49 Op. Atty. Gen. at 154-55.