Argued and submitted January 16; decision of Court of Appeals affirmed, judgment of circuit court reversed, and case remanded to circuit court for further proceedings April 23, 2020

LINN COUNTY,
Douglas County, and Yamhill County,
each a local government of the State of Oregon,
*Petitioners on Review,*
*and*
JEFFERSON COUNTY et al.,
*Plaintiffs,*
*v.*
Kate BROWN,
in her official capacity as
Governor of the State of Oregon; and
Val Hoyle, in her official capacity as Commissioner of
the Oregon Bureau of Labor and Industries,
*Respondents on Review.*

(CC 16CV17209) (CA A165655) (SC S066856)

461 P3d 966

The trial court granted plaintiff counties declaratory relief, excusing them from compliance with the paid sick leave law based on Article XI, section 15, of the Oregon Constitution. Defendants appealed, arguing that the paid sick leave law is not a "program" within the meaning of Article XI, section 15. The Court of Appeals reversed, holding that that provision concerns only traditional government programs, and that the paid sick leave law was not such a program. *Held*: The paid sick leave law is not a "program" for purposes of Article XI, section 15, of the Oregon Constitution and, therefore, that constitutional provision does not exempt plaintiffs from compliance with the paid sick leave law.

The decision of the Court of Appeals is affirmed. The judgment of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.

En Banc

On review from the Court of Appeals.*

Sharon A. Rudnick, Harrang Long Gary Rudnick P.C., Portland, argued the cause and filed the briefs for petitioners

_____
    * Appeal from Linn County Circuit Court, Daniel R. Murphy, Judge. 297 Or App 330, 443 P3d 700 (2019).

on review. Also on the briefs were Susan Marmaduke, Portland, and William F. Gary, Portland.

Michael A. Casper, Assistant Attorney General, Salem, argued the cause and filed the brief for respondents on review. Also on the brief were Ellen Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Steven C. Berman, Stoll Stoll Berne Lokting & Shlachter PC, Portland, filed the brief for *amicus curiae* Family Forward Oregon.

Ross M. Williamson, Local Government Law Group PC, Eugene, filed the brief for *amici curiae* Association of Oregon Counties, League of Oregon Cities, and Special Districts Association of Oregon.

BALMER, J.

The decision of the Court of Appeals is affirmed. The judgment of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.

**BALMER, J.**

This case requires us to decide whether three counties are exempt from the requirements of Oregon's paid sick leave law under the unfunded programs provision of the Oregon Constitution, Article XI, section 15. We conclude that the paid sick leave law does not require local governments to implement a "program" under that provision and, therefore, that the counties are not exempt from that statute.

We begin by describing the statute and the constitutional provision at issue here. Oregon's paid sick leave law was enacted in 2015 and provides that "[e]mployers that employ at least 10 employees working anywhere in this state shall implement a sick time policy that allows an employee to accrue" a specified amount of paid sick time, depending on the total number of hours the employee works. ORS 653.606(1)(a). The statute defines "employer" to include both private and public employers—including counties, cities, and other public entities. ORS 653.601(2)(a)-(c). As relevant here, the paid sick leave law requires all employers with 10 or more employees to adopt policies and procedures for paid sick leave that meet minimum requirements set out in the statute.

Twenty years before the passage of the paid sick leave law, the voters passed Ballot Measure 30 (1996), which had been referred from the legislature as House Joint Resolution (HJR) 2 (1995). The enacted measure added a new provision, Article XI, section 15, to the Oregon Constitution. That provision requires the legislature to provide funding to local governments when it requires them to establish new "programs" (or to increase the level of services in existing required programs); if the legislature fails to provide funding, the affected local governments are exempt from the requirement of complying with the new program. As adopted, the measure included a sunset provision, but, in 2000, the voters passed Ballot Measure 84 (2000), another referral from the legislature, which repealed the sunset provision while retaining the rest of the original measure.

This case requires us to interpret Article XI, section 15, which provides:

> "[W]hen the Legislative Assembly or any state agency requires any local government to establish a new program or provide an increased level of service for an existing program, the State of Oregon shall appropriate and allocate to the local government moneys sufficient to pay the ongoing, usual and reasonable costs of performing the mandated service or activity."

Or Const, Art XI, § 15(1). A "program" is defined as "a program or project imposed by enactment of the Legislative Assembly or by rule or order of a state agency under which a local government must provide administrative, financial, social, health or other specified services to persons, government agencies or to the public generally." *Id.* § 15(2)(c).

If the legislature requires local governments to establish a "new program" or to provide an increased level of service for an existing program that will "require[] the expenditure of money by the local government," the "local government is not required to comply" with that requirement unless the legislature provides at least 95 percent of the cost that would be incurred by the local government. *Id.* § 15(3)(a). A different subsection provides that a local government is not required to comply with a newly imposed "program" if the local government would have to spend in excess of one-hundredth of one percent of its annual budget to implement the program, in addition to any amount appropriated by the legislature. *Id.* § 15(3)(b). That provision effectively sets a financial threshold for a local government to "refuse to comply" with a required program. Finally, the central provision of Article XI, section 15, which requires the state to fund local government compliance with new state "programs," does *not* apply to certain required expenditures, the most significant of which is "[a]ny law that is approved by three-fifths of the membership of each house of the Legislative Assembly." *Id.* § 15(7)(a).[1]

Article XI, section 15, also provides an exception for private businesses in certain circumstances. If a local government is exempt from compliance with a required

---

[1] A number of other specific exceptions are set out in Article XI, section 15(7), but do not affect our analysis of the scope of the provision's constitutional directive in section 15(1).

program based on its cost and the lack of a state appropriation, then, "if a nongovernment entity competes with the local government by selling products or services that are similar to the products and services sold under the enterprise activity, the nongovernment entity is not required to comply with the state law or administrative rule or order relating to that enterprise activity." *Id.* § 15(8). An "enterprise activity" is defined as "a program under which a local government sells products or services in competition with a nongovernment entity." *Id.* § 15(2)(a).

To summarize, Article XI, section 15, of the Oregon Constitution exempts local governments from being required to implement programs mandated by the state, if the state has not provided adequate funding and the cost of implementing the program exceeds a certain threshold. The question before us, then, is whether the paid sick leave law, ORS 653.601 to 653.661, requires local governments with more than 10 employees to implement a "program" under Article XI, section 15.

## FACTS AND PROCEDURAL BACKGROUND

We turn to the facts of this case. The original plaintiffs in this action were nine Oregon counties[2] that sought declaratory relief, alleging that the paid sick leave law required them to spend money on a program without sufficient state reimbursement, as required by Article XI, section 15, and that they consequently were not required to comply with that statute.[3] Defendants, the governor and the Commissioner of the Bureau of Labor and Industries, responded that the constitutional provision does not apply to the paid sick leave law because that law is not a "program" within the meaning of Article XI, section 15(1), and, additionally, that not all nine plaintiff counties met the cost threshold required to make Article XI, section 15(3), applicable to them.

---

[2] The declaratory judgment action was filed by Douglas, Jefferson, Linn, Malheur, Morrow, Polk, Sherman, Wallowa, and Yamhill counties.

[3] The parties do not dispute that funds were not appropriated to local governments or other employers to implement the paid sick leave law, nor do they dispute that the paid sick leave law was passed by less than a three-fifths majority in both houses of the Legislative Assembly.

The parties filed cross-motions for summary judgment. The trial court initially granted plaintiffs' motion, concluding that the paid sick leave law was an unfunded "program" within the meaning of Article XI, section 15. The court also denied defendants' motion for summary judgment. On reconsideration, the trial court affirmed its ruling on the merits, but concluded that not all the plaintiffs had met the cost threshold that would permit them to refuse to comply with the paid sick leave law. The parties later stipulated that three of the nine counties—Linn, Douglas, and Yamhill—did meet the cost threshold and agreed that the claims of the other six counties should be dismissed in a limited judgment. The trial court therefore entered a general judgment in favor of Linn, Douglas, and Yamhill counties, excusing them from compliance with the paid sick leave law pursuant to Article XI, section 15(3).

Defendants appealed. They argued that the trial court erred in granting plaintiffs' motion for summary judgment because the text, context, and legislative history of Article XI, section 15, demonstrate that a statutory policy requiring all employers—whether private or public—with a certain number of employees to provide certain employee benefits is not a "program" for purposes of that constitutional provision, and, therefore, that subsection 15(3)(a) does not exempt plaintiffs from complying with the paid sick leave law. In response, plaintiffs argued that the term "program" as used in Article XI, section 15, is not limited to traditional government programs, as the state's argument suggested, and that the language of Article XI, section 15, as well its context and legislative history, support a broad, rather than a narrow, reading of the term.

The Court of Appeals reversed, concluding that "Article XI, section 15, addresses state enactments that require unfunded *government* programs to actively perform, provide, or deliver services to others." *Linn County v. Brown*, 297 Or App 330, 342, 443 P3d 700 (2019) (emphasis in original). The court looked to existing statutory and constitutional frameworks, the voters' pamphlet statements describing the relevant ballot measures, and the history of the legislative referral. Examining the use of the term "program" in other statutes and constitutional provisions, the court concluded

that Article XI, section 15, "concerns what is traditionally understood as government programs, *i.e.*, the provision of public services to others." *Id.* at 344. The court also noted that much of the discussion surrounding the ballot measures involved the phrase "unfunded mandates," but that there was significant "conceptual confusion about the meaning of 'unfunded mandates'" throughout the history of the measure, its passage, and subsequent interpretations. *Id.* at 347. The court ultimately held that "Article XI, section 15, concerns state enactments that require unfunded government programs to perform, provide, or deliver services to individuals, agencies, or the public at large. The paid sick leave law *** is not a 'program' for government services to others within the meaning of the unfunded programs measure." *Id.* at 354.[4] Plaintiffs filed a petition for review, which we granted.

## THE TEXT IN CONTEXT OF ARTICLE XI, SECTION 15

This court "interpret[s] referred constitutional amendments within the same basic framework as we interpret statutes: by looking to the text, context, and legislative history of the amendment to determine the intent of the voters." *State v. Sagdal*, 356 Or 639, 642, 343 P3d 226 (2015). *See also Ecumenical Ministries v. Oregon State Lottery Comm.*, 318 Or 551, 560, 871 P2d 106 (1994) (same); *State v. Reinke*, 354 Or 98, 106, 309 P3d 1059, *adh'd to as modified on recons*, 354 Or 570, 316 P3d 286 (2013) (same). That history includes, among other things, "preexisting constitutional provisions, case law, and statutory framework," *Sagdal*, 356 Or at 642, legislative hearings and deliberations, *State v. Lane*, 357 Or 619, 634, 355 P3d 914 (2015), and "the ballot title and associated information in the voters' pamphlet." *Id.* at 631-32. The focus of the inquiry is to determine "the meaning

---

[4] The Court of Appeals also concluded that Article XI, section 15, "is not addressed to all ordinary laws of general application, such as ones involving employee relations in businesses at large," *Linn County*, 297 Or App at 342, and seemed to suggest that the provision may apply only to laws directed exclusively at local governments. Plaintiffs argue that the text of the measure is not so limited. We need not and do not decide that question here because, regardless of whom else the paid sick leave law applies to, we conclude, for reasons explained in this opinion, that it is not a "program" that requires "specified services to persons, government agencies or to the public" for purposes of Article XI, section 15(1).

understood by the voters who adopted" the measure. *Id.* at 625. The degree to which the enactment history of a constitutional provision is useful to this analysis, however, "depend[s] on the circumstances—including the clarity with which the legislature's or the people's intentions have been expressed in the text of an enactment and the nature of the history itself." *Id.* at 634. With that framework in mind, we turn to the text, context, and legislative history of Article XI, section 15.

As described above, the provision at issue exempts local governments from implementing state "programs" that will require the local government to expend funds over a certain cost threshold. Defendants argue that the Court of Appeals correctly concluded that the paid sick leave law is not a "program" within the meaning of Article XI, section 15, because the word "program" was intended to mean the provision of "traditional government services" such as police, fire departments, and schools, among others. Plaintiffs take issue with that conclusion, asserting that defendants and the Court of Appeals have an unduly narrow view of what constitutes a "program." They note that the text of the provision does not refer to "traditional" government services, and that the term "program" is specifically defined to include "administrative, financial, social, health or other specified *services to persons*," Or Const, Art XI, § 15(2)(c) (emphasis added), suggesting an expansive scope that easily includes implementation of the paid sick leave law.

We begin with the text of Article XI, section 15, because "[t]he best evidence of the voters' intent is the text of the provision itself." *Ecumenical Ministries*, 318 Or at 559 (internal quotation marks omitted). As noted, subsection (2) of that constitutional provision defines a "program" as

> "a program or project imposed by enactment of the Legislative Assembly or by rule or order of a state agency under which a local government must provide administrative, financial, social, health or other specified services to persons, government agencies or to the public generally."

Or Const, Art XI, § 15(2)(c). Plaintiffs are correct that, although the definition of "program" specifically contemplates the provision of services by local governments, the

definition is not on its face limited to "government" pro-
grams, let alone "traditional" government services, as the
Court of Appeals suggested. Of course, in constitutional as
well as statutory interpretation, "courts are not to insert
what has been omitted, or to omit what has been inserted."
*AAA Oregon/Idaho Auto Source v. Dept. of Rev.*, 363 Or 411,
418, 423 P3d 71 (2018) (internal quotation marks omitted).
Moreover, plaintiff continues, "program" is defined to mean,
in part, a state requirement that local governments provide
"specified services" to "persons." From that text, plaintiffs
argue that the paid sick leave law is a "program" because
it requires local governments to provide "specified services"
(here, sick leave benefits) "to persons" (here, local govern-
ment employees).

  But other aspects of the text support defendants'
proposed interpretation. The definition that the text pro-
vides of "program" expressly refers to something "imposed"
by the state "under which a *local government* must provide
\*\*\* services to persons, government agencies or to the pub-
lic generally." Or Const, Art XI, § 15(2)(c) (emphasis added).
That wording at least indicates that the types of "programs"
or the provision of "services" that Article XI, section 15, was
intended to cover are those that local governments can or do
provide, whether or not they also may be provided by others.

  Moreover, although the definition in Article XI, sec-
tion 15(2)(c), is in part tautological—"'Program' means a pro-
gram \*\*\*"—the remainder of the definition does narrow the
somewhat abstract and general dictionary definition of "pro-
gram" as "a plan of procedure : a schedule or system under
which action may be taken toward a desired goal." *Webster's
Third New Int'l Dictionary* 1812 (unabridged ed 1993). In
particular, the additional words in the constitutional defini-
tion limit the scope of "program" to "specified *services*" that
"a local government must provide \*\*\* to persons, govern-
ment agencies or to the public generally." Or Const, Art XI,
§ 15(2)(c) (emphasis added). But an employer's offer of paid
sick leave to employees does not fit easily into the concept of
"services" that are "provided" to "persons." The ordinary defi-
nition of "service" is "the *performance of work* commanded or
paid for by another," an "action or use that furthers some
end or purpose : conduct or performance that assists or

benefits something : deeds useful or instrumental toward some object." *Webster's* at 2075 (emphasis added). "Services" to "persons" thus appears to mean work or actions or conduct of some kind that "assists" or "benefits" the persons receiving the services and thus accomplishes some particular "end or purpose." As defendants correctly point out, the usual understanding of "services" in the employment context would be that *employees* "provide" "services" to *employers*, and, in exchange, employers provide *compensation* (including benefits) to employees. And while it is true that a local government's employees are "persons," the use of that word in the definition suggests that it is intended to apply to individuals or constituents who receive local government "services" in their capacity as beneficiaries, rather than to employees of the local government who receive employment benefits in their capacity as employees.

Certainly, as plaintiffs assert, the paid sick leave law establishes an "end" or "object" that the legislature wanted to achieve, and eligible employees are persons who benefit from that law. But that does not mean that the paid sick leave law requires local governments to "provide specified services to persons" within the meaning of Article XI, section 15.

We recognize, of course, that the legislature "may and often does choose broader language that applies to a wider range of circumstances than the precise problem that triggered legislative attention," and we generally "take the legislature at its word." *Comcast Corp. v. Dept. of Rev.*, 356 Or 282, 307, 337 P3d 768 (2014) (internal quotation marks omitted). And, as noted, plaintiffs make several valid points about the Court of Appeals' textual analysis. Nevertheless, for the reasons just discussed, defendants have a somewhat stronger textual argument that "program," as that term is used in Article XI, section 15, does not include the paid sick leave law.[5]

---

[5] Plaintiffs also argue that the "enterprise exception" in Article XI, section 15(8), supports their view that the paid sick leave law is a "program" for purposes of the constitutional provision. That subsection, as noted, exempts nongovernmental entities from compliance with a state-required program if they "compete" with a local government in the sale of products or services and the local government is not required to comply because the state has not provided funding.

## THE CONTEXT OF EXISTING LAWS

To further evaluate the parties' competing positions we, like the Court of Appeals, turn to "preexisting constitutional provisions and the statutory framework existing" when Article XI, section 15, was adopted. *Linn County*, 297 Or App at 342. The Court of Appeals considered the term "program" as it is used in statutes such as the Local Budget Law, ORS 294.305 to 294.565, and in several subsections of Article XV, section 4, which require or authorize the legislature to use State Lottery proceeds to fund certain "programs." *Linn County*, 297 Or App at 342-44. The court viewed that context as supporting defendants' contention that a "program" means a "government program," which is "the provision of public services to others," *id.* at 344, and therefore not so expansive as to apply to the paid sick leave law.

Plaintiffs again challenge that holding, asserting that the use, in other contexts, of the word "program" to refer to expenditures by governments does little to assist in understanding what the word means in Article XI, section 15. Indeed, they argue that the preexisting framework supports their view that, even if "program" is limited to programs that government is required to implement, then the paid sick leave law—to the extent that it requires local governments to offer that benefit to their employees—is just such a program. They also note that the paid sick leave law itself uses the word "program" in referring to the obligations of employers "with a sick leave policy, paid vacation policy, paid personal time off policy or other paid time off program ***." ORS 653.611(1). That demonstrates, they argue, that the legislature considered the paid sick leave law a "program" for purposes of Article XI, section 15.

For their part, defendants also reiterate the "text in context" arguments that we have considered above. They

Plaintiffs' point is that the inclusion of the enterprise exception would serve no purpose unless Article XI, section 15, applied to laws of general applicability—such as the paid sick leave law—and not only to laws directed exclusively at local governments. As discussed, 366 Or at 340 n 4, however, our decision here is based on our interpretation of "program" for purposes of Article XI, section 15, and does not turn on the entities to whom a program does or does not apply. Plaintiffs' argument regarding the enterprise exception is inapposite.

agree with plaintiffs that the word "program," in the abstract, could have a broader meaning, but insist that other provisions in Article XI, section 15, as well as the way that "program" is used in other constitutional and statutory contexts discussed by the Court of Appeals, support a more specialized meaning. They argue that the legislature in making its referral, and the voters in enacting the measure, understood the "programs" and "services" to which the measure applied to be government service programs that local governments, in their capacity as governments, were required by the legislature to provide.

Not to put too fine a point on it, existing constitutional and statutory provisions that use the word "program" for such diverse purposes as the use of lottery funds for watershed education activities, Article XV, section 4b(3)(d), or required reports by state agencies to the legislature about substantive changes in their activities, ORS 291.373(1)-(2), provide little guidance in construing the word in Article XI, section 15. Indeed, some of the cited provisions contain their own definitions of "program," and thus are of no assistance whatsoever. The parties' arguments regarding context, however, do demonstrate that the term "program" may have different meanings throughout Oregon law, depending on context, and those arguments provide some marginal support for defendants' position, in that the term is most often used when the program is one where a government entity is providing services or money or is engaged in activities for the benefit of the public. The stronger basis for that interpretation, however, comes from the text of Article XI, section 15, itself, as discussed above, which has its own definition of "program." But neither the text nor the context persuasively eliminates the possibility that the provision was intended to cover the wider range of obligations imposed on local governments, as plaintiffs contend.

## REFERRAL AND ENACTMENT HISTORY

We turn to the legislative history of Article XI, section 15, including the background against which the legislature in 1995 passed HJR 2 and referred it to the people. The Court of Appeals correctly noted that the measure arose in the context of a national and state debate in the 1990s

about "unfunded mandates." *Linn County*, 297 Or App at 352-54. However, not only does that phrase not appear in Article XI, section 15, but neither word standing alone is anywhere in the text of the measure. Moreover, as the Court of Appeals observed, from the Oregon measure's origins in the legislature to the way its purpose and reach was communicated to voters, there persisted "conceptual confusion" about "unfunded mandates." *Id*. at 352. The Court of Appeals ultimately relied on history from the legislature as well as information provided to voters to conclude that "the enactment history of Article XI, section 15, [does not] indicate[] that the measure is a limitation on anything other than state enactments that impose on local governments unfunded government programs to perform, provide, or deliver services to others." *Id*. at 351.

As described above, our focus when we construe a legislatively referred constitutional amendment is to determine "the meaning understood by the voters who adopted" the measure in question. *Lane*, 357 Or at 625. To make that determination, we examine, *inter alia*, the ballot title, arguments for and against the measure included in the voters' pamphlet, and news reports and editorial comments from the time the measure was being considered. *Ecumenical Ministries*, 318 Or at 560 n 8; *see also Shilo Inn v. Multnomah County*, 333 Or 101, 130, 36 P3d 954 (2001), *adh'd to as modified on recons*, 334 Or 11, 45 P3d 107 (2002) (describing the relevant history as including "materials that are included in the Voters' Pamphlet, such as the ballot title, the explanatory statement, and the legislative argument in support"). But we also have recognized that

> "the voters have the opportunity to give their approval only after the legislature drafts a measure and, after deliberation, deems it worthy of submission to them. *** Certainly, [those deliberations] are at least as germane to the intended meaning of a measure as a newspaper editorial that we have no way of knowing anyone actually read."

*Lane*, 357 Or at 634.

As the Court of Appeals and the parties all discuss, the actions by the legislature and the voters that led to the enactment of Article XI, section 15, took place in the

context of a national discussion over "unfunded mandates," so we begin with a brief review of that issue. At the federal level, "'[u]nfunded mandates' were a major issue in the 1994 congressional elections." Daniel H. Cole & Carol S. Comer, *Rhetoric, Reality, and the Law of Unfunded Mandates*, 8 Stan L & Pol'y Rev 103, 103 (1997). The federal Unfunded Mandates Reform Act, Pub L 104-4, 109 Stat 48 (1995), declared its purposes to include:

> "to end the imposition, in the absence of full consideration by Congress, of Federal mandates on State, local, and tribal governments without adequate Federal funding, in a manner that may displace other essential State, local, and tribal governmental priorities."

2 USC § 1501(2). The statute defined "Federal mandate" as "any provision in statute or regulation or any Federal court ruling that imposes an enforceable duty" on one of the identified governments, including as a condition of federal assistance or arising from participation in a voluntary federal program. 2 USC § 1555.

The central concern regarding "unfunded mandates" was that the federal government was requiring state, local, and tribal governments to take certain actions without providing the funding needed to do so. Despite the extensive debate, however, there is not now and never has been a consensus on what precisely the term "unfunded mandates" means. Julie A. Roin, *Reconceptualizing Unfunded Mandates and Other Regulations*, 93 Nw U L Rev 351, 352 n 5 (1999) (noting that "[t]here are almost as many definitions as there are articles written on the subject of unfunded mandates"). The phrase "first appeared in the late 1970s, when the rate of increase in federal intergovernmental mandates began to outpace the rate of increase in federal grants to state and local governments," and became "a shorthand phrase that sums up the tensions and grievances of the federal system characterized by deficits at the national level, and by budget shortfalls, increased taxes, and service cutbacks at the State and local levels." Cole & Comer, 8 Stan L & Pol'y Rev at 105.[6]

---

[6] Ultimately, the Unfunded Mandate Reform Act of 1995 had limited substantive impact and served primarily "to *deter* the passage of unfunded mandates,"

As states became concerned about federal require-
ments that they undertake new programs without addi-
tional federal funding, so too local governments objected to
programs that state legislatures imposed on them but failed
to fund. *See* Official Voters' Pamphlet, General Election,
Nov 5, 1996 (1996 Voters' Pamphlet), 26 (Argument in Favor,
Measure 30) (noting that 15 states had passed constitu-
tional amendments limiting unfunded mandates). Against
that backdrop, the 68th Oregon Legislative Assembly con-
sidered two different versions of the resolution that was
ultimately referred to the voters as Ballot Measure 30,
with the intention of addressing some category of state gov-
ernment requirements on local governments that could be
called unfunded "programs." By comparing the wording of
these two resolutions—HJR 2, the version finally passed,
and HJR 17 (1995)—we can see that the legislature con-
templated but ultimately rejected a much wider-reaching
version of the proposed amendment and submitted the less
expansive proposal to the voters.

As previously explained, HJR 2, the version passed
by the legislature and then by the voters, defined "program"
in part as "a program or project imposed by enactment of the
Legislative Assembly or by rule or order of a state agency
\*\*\*." HJR 2, para 1, § 15(2)(c). HJR 17, however, would have
included a significantly broader definition of the programs
to which the constitutional limitation would apply: "any pro-
gram, *procedure*, project or *responsibility* imposed by enact-
ment of the Legislative Assembly or by rule or order of a state
agency \*\*\*." HJR 17, para 1, § 15(2)(b) (emphases added).
Similarly, while HJR 2 required the legislature to appropri-
ate funds needed "to establish a new program or provide an
increased level of service for an existing program," HJR 2,

---

Roin, 93 Nw U L Rev at 353 n 7 (emphasis added), by permitting legislators to
raise a point of order against unfunded mandate legislation, 2 USC § 658(d), and
requiring the Congressional Budget Office to prepare cost estimates on certain
regulatory activities. 2 USC §§ 658b-658f. The federal law did not explicitly pro-
hibit the passage of legislation that would impose unfunded mandates on states,
but instead sought primarily to "reduce the number of unfunded federal man-
dates and enhance congressional oversight of agency decisionmaking," the result
of which "*could* be better, though not necessarily fewer, federal mandates to state
and local governments." Cole & Comer, 8 Stan L & Pol'y Rev at 104 (emphasis in
original).

para 1, § 15(1), HJR 17 would also have required state funding for "*any* other state-assigned *responsibilities* requiring the expenditure of local revenues." HJR 17, para 1, § 15(1) (emphases added).

The most significant of these differences was the scope of the state requirement that would trigger an exemption and permit a local government to refuse to comply with the requirement, if the state failed to provide funding. HJR 2 exempted local governments from compliance if the state law "requires the expenditure of money by the local government *for a new program or increased level of service* for an existing program." HJR 2, para 1, § 15(3) (emphasis added). HJR 17 would have gone much further, reaching "*any* state law \*\*\* *that requires the expenditure of moneys* by the local government." HJR 17, para 1, § 15(3) (emphases added). Thus, while HJR 17 would have applied to *any* law that requires *any* expenditure of local funds, HJR 2 as finally passed reached a narrower range of state laws—only those that require the implementation of a "new program" or an "increased level of service for an existing program." HJR 2, para 1, § 15(1).

The difference between the relative sweep of HJR 2 and HJR 17 is significant in the plain meaning of the words that the legislature chose. *Webster's* defines "responsibility" as "the quality or state of being responsible : such as : moral, legal, or mental accountability." *Webster's* at 1935. The term "program," on the other hand, means "a plan of procedure : a schedule or system under which action may be taken toward a desired goal : a proposed project or scheme," *id.* at 1812, and "project" is defined as "a specific plan or design : such as a devised or proposed plan : a scheme for which there seems hope of success." *Id.* at 1813. Where the term "responsibilities," then, refers to *any* obligation, the terms "program" and "project" mean something more specific.

Although the difference between the scope of the state laws covered by HJR 2 and HJR 17 does not tell us exactly how to interpret "program" in Article XI, section 15, there can be little doubt that HJR 17 would more readily have covered the paid sick leave law: that statute imposes a "responsibility" on local governments, and it is a state law

that "requires the expenditure of moneys." The legislature rejected HJR 17. We presume that the legislature intentionally chose HJR 2, the option with narrower wording that would cover fewer and more specific state requirements. And, likewise, it stands to reason that the voters understood Measure 30 to have the more limited scope that its text plainly describes. That policy choice tends to undercut plaintiffs' argument for a sweeping interpretation closer to the breadth of HJR 17.

Finally, we turn to the materials presented to the voters when they considered Measure 30 in 1996 and Measure 84 in 2000. The legislative argument in support of Measure 30 made the point that, under existing law, the state could "compel a local government to provide financial, social, health and other services *to the public*," but did not have to provide any money "to pay the cost of those services." 1996 Voters' Pamphlet at 24 (emphasis added).[7] Speaker of the House Bev Clarno's separate argument in favor said that under Measure 30, "if the state says to counties and cities that they *have to provide a service*, the state has to foot the bill. If the state is not paying the price, the county or city can decline to *provide the service*." *Id.* at 25 (emphases added). Local government officials from Jackson County supported Measure 30 because it would apply, they asserted, to new state-required programs related to elections, land use planning, property assessment and taxation, and providing rights-of-way to utilities. *Id.* at 27. Governor John Kitzhaber submitted an argument in opposition, pointing out that the measure would create confusion "about who pays for what services," using as examples public kindergartens, sewers, and land use planning. *Id.* at 28.[8]

---

[7] When the legislature refers a measure to the voters, the voters' pamphlet includes an "explanatory statement," which is "an impartial, simple and understandable statement explaining the measure," prepared by a legislative committee, ORS 251.215(1), a legislative argument in support of the measure, prepared by a different legislative committee, ORS 251.245, and arguments for and against the measure, submitted by interested persons, ORS 251.255.

[8] We express no opinion as to whether any specific programs in the general areas of government policy identified in the Voters' Pamphlet arguments would or would not be subject to Article XI, section 15. We refer to those general areas only to describe the information provided to voters in connection with Measure 30 and Measure 84.

        Similar arguments appeared in the Voters' Pamphlet in 2000, when the voters were presented with Measure 84, which removed the sunset provision and thereby made Article XI, section 15, a permanent part of the constitution. An argument in favor described the kinds of new programs that the legislature would have to fund if it wanted local governments to provide them: "public safety districts such as fire and 9-1-1 communications, as well as other districts such as water, sewer, parks & recreation, and library." Official Voters' Pamphlet, General Election, Nov 7, 2000, (2000 Voters' Pamphlet), 10. Another argument in favor stated that the measure would provide greater choice "in deciding to fund local services such as fighting crime, maintaining parks, and helping children at risk." *Id.* at 11.

        Significantly, not a single one of the 20 explanatory statements and arguments for and against that were submitted regarding the 1996 and 2000 measures gives any hint that either supporters or opponents believed, understood, or intended that the measures applied to public employee compensation and benefits or to the internal administrative policies of local government. Virtually every example of the kind of law that the measures were intended to cover was of a state law imposing requirements on local government *qua* government to provide particular services to the public, such as elections, taxation, and utility services.[9]

        Plaintiffs point to the many references in the Voters' Pamphlet arguments to "unfunded mandates," "local control," and the general concept that "if the state says to counties and cities that they have to provide a service, the state

---

[9] Petitioners emphasize that various city officials, when asked by the League of Oregon Cities to identify the top "unfunded mandates" impacting their city, mentioned policies similar in character to the paid sick leave law, such as Occupational Health and Safety Administration rules, the Americans with Disabilities Act, and Workers' Compensation. However, we have cautioned against relying too heavily on statements of interested parties for the precise meaning of a proposed measure, "because of the partisan character of such material." *Sagdal*, 356 Or at 643. And, as defendants point out, the fact that cities came up with an expansive list of state requirements that they considered financially burdensome is not surprising, but does not necessarily bear on what the term "program" in Article XI, section 15, actually encompasses. Moreover, the League of Oregon Cities requested this information from city officials prior to the passage of HJR 2, and referred only to "unfunded mandates" generally, using neither a specific definition of that term nor wording from HJR 2 or HJR 17.

has to foot the bill." 1996 Voters' Pamphlet at 25 (Argument in Favor submitted by Speaker Bev Clarno). But those references—given that the only examples of affected programs mentioned in the Voters' Pamphlets are those in which governments provide specific services to the public, as just discussed—actually support defendants' view that the general concepts of "unfunded mandates" and "local control," even if lacking clarity, are focused on required services to the public that one level of government imposes on another.

Plaintiffs also argue that, because the explanatory statements in the Voters' Pamphlets for both Measures 30 and 84 list certain programs to which the measures expressly do *not* apply—and that list does *not* include paid sick leave or other aspects of employment—voters would have understood that the measure *did* apply to state laws concerning those subjects. *See* 1996 Voters' Pamphlet at 24; 2000 Voters' Pamphlet at 8. However, the explanatory statements simply summarized the specific exceptions contained in the text of Article XI, subsection 15(7). They thus provide little assistance in understanding how the voters would have understood the scope of the key terms "program" and "services" used in the text of subsection 15(1). That is particularly true given the many examples of "programs" in the Voters' Pamphlet arguments submitted by supporters and opponents and discussed above, almost all of which involve local governments—acting in their capacity as governments—providing services to their constituents.

## SUMMARY AND APPLICATION

We can summarize the discussion above as follows: Article XI, section 15(1), provides that, when the state "requires any local government to establish a new program," the state must provide the local government sufficient funds to cover the costs "of performing the mandated service or activity." The measure defines "program" as a "program or project *** under which a local government must provide administrative, financial, social, health or other specified services to persons, government agencies or to the public." *Id*. § 15(2)(c). Although the word "program" in the abstract might be expansive enough to cover a state requirement

that all employers, including local governments of a certain size, provide paid sick leave to their employees, the text suggests a narrower focus—on specific "services" that a "local government" is to "perform" for "persons, government agencies or *** the public generally." *Id.* The text of the measure thus indicates that "program," as used in Article XI, section 15, likely does not include a state requirement that all employers of a certain size, as employers, provide employees with a particular employee benefit.

The referral and enactment history of the provision more clearly supports a narrower, rather than a broader, interpretation of the "programs" that are subject to the provision. The legislature considered two substantially different proposals to refer to the voters. It rejected HJR 17, which would have applied to "any program, procedure, project or responsibility" imposed by the state, and would have exempted local governments from "any other state-assigned responsibilities" that would require local spending. HJR 17, para 1, § 15(2)(b). The legislature instead referred the narrower measure, applying to "programs," consisting of "specified services," that local governments were required to "provide." HJR 2, para 1, § 15(2)(c). Similarly, when Measure 30 and Measure 84 were put before the voters, the legislative explanatory statements and the arguments for and against the measures focused on specific *government services* that the state required from local governments. To be sure, the broad concepts of "unfunded mandates" and "local control" were mentioned multiple times, but the only examples offered of "programs" that might be affected by the measures were services such as elections, land-use planning, parks, and libraries. To the extent we can discern what the voters understood the measures to mean when they voted in favor of them, we conclude that they intended to adopt a less sweeping view than that urged by plaintiffs.

We return to the specific question that this case presents: whether Article XI, section 15, applies to the paid sick leave law. Plaintiffs argue that the paid sick leave law is just the kind of broad policy enactment by the legislature to which Article XI, section 15, was intended to apply. According to plaintiffs, because "the legislature saw the

[paid sick leave] law as a means to address the impacts of broad socio-economic inequities in Oregon, and to protect employees, individuals, businesses, and the public generally from the impacts of avoidable illnesses," the law is, necessarily, a "program." As such, they contend that, because the state failed to provide funding for them to cover the newly imposed costs, they are exempt from the paid sick leave law.

We disagree. As discussed above, "program" for purposes of Article XI, section 15, focuses on "specified services" that local government is to provide "to persons, government agencies or to the public generally." *Id.* § 15(2)(c). Paid sick leave is a statutory policy choice regarding an employee benefit that the legislature determined to be appropriate and that it now requires of all employers—public and private, profit and nonprofit—of a certain size. Such a legislative policy may well be directed at perceived socio-economic inequities, as the paid sick leave law is, but that does not make it a "program." Contrary to plaintiffs' claims, whether a policy is a "program" is not determined by the intention behind the policy, but rather by the type of local government action that the policy requires. A policy that regulates one aspect of the employment relationship by requiring employers to offer a particular employee benefit obviously means that the employer must take specific administrative steps to implement the policy. However, a local government is required to take those internal actions simply because it is an employer of a certain size. Those required administrative actions do not mean that the paid sick leave law is a new "program" of "services to persons, government agencies or to the public generally."

For the reasons explained above, we conclude that the paid sick leave law is not a "program" for purposes of Article XI, section 15. That constitutional provision, therefore, does not exempt plaintiffs from compliance with the statute.

The decision of the Court of Appeals is affirmed. The judgment of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.